HARM B. HESPIN, APPELLANT, V. JOHN F. WENDELN ET. AL.,
APPELLEES.

FILED OCTOBER 9, 1909.   No. 15,757.

1. **Specific Performance: EVIDENCE.** Direct evidence that a testator
made an oral contract with his stepson that he should remain in
the family, assist in managing the testator's business, carry on
the work of the farm, and perform the duties of a son until he
should become 21 years of age, on condition that at that time he
should receive a team, harness and wagon, and at the death of
the testator share equally with his own children in his estate,
if clear and satisfactory, will entitle the plaintiff to a decree for
specific performance where it is apparent that he has fully per-
formed the contract on his part.

2. **Evidence examined, and *held* sufficient** to require a finding and judg-
ment for the plaintiff.

APPEAL from the district court for Otoe county: PAUL
JESSEN, JUDGE. *Reversed with directions.*

*Pitzer & Hayward,* for appellant.

*S. P. Davidson* and *Corydon Rood, contra.*

BARNES, J.

This action was brought in the district court for Otoe
county to enforce the specific performance of an alleged
verbal contract between the plaintiff and one John A.
Wendeln, deceased. The trial resulted in a finding and
judgment for the defendants, and the plaintiff has ap-
pealed. This brings the case before us for a trial *de novo,*
and we are required to make our finding and form our
conclusion from the evidence contained in the record, with-
out particular regard to the findings and judgment of the
trial court.

It appears that the plaintiff was born out of wedlock as
the natural son of his mother about nine years before her
marriage to John A. Wendeln. The contract sought to
be enforced and the facts on which plaintiff bases his claim

are set out in the petition, in substance, as follows: The plaintiff's mother and John A. Wendeln were married in Etzel, Germany, when plaintiff was nine years of age, and moved immediately after their marriage to Otoe county, Nebraska, where they lived to the time of their respective deaths; that after their removal to America the plaintiff remained in the family of his mother and stepfather, and worked upon the farm where they lived, without wages, until after he became of age; that about a year after that time he received from his stepfather a team, harness and wagon. It is further alleged that the plaintiff never knew his father; that his mother received from his own father a considerable sum of money, at least $200 in amount, to be used for plaintiff's benefit, and to assist his mother in caring for him; that she worked out and provided for herself, and upon her marriage to John A. Wendeln this money was used in bringing the family to America, and to start them in farming; that from the time of their arrival in America the plaintiff took his stepfather's name, and was known by that name during his boyhood, at home, at school and generally among the people of the community where he lived; that he habitually called his stepfather "Pa," and was called by him "My Harm, my son, and my child"; that the plaintiff after coming to America was permitted to attend school a few months, and learned to speak and write the English language readily; that he was kept at work almost constantly in assisting his stepfather in breaking out land purchased, in bringing the same into a state of cultivation, and in the farm work generally; that not only in this way did he assist his stepfather, but he also assisted him in business matters and in the management of the farm, so that his stepfather was dependent upon him and trusted him as his own son. The petition further alleged that during the year 1878, when plaintiff was 16 years of age, he was offered employment in a drug store in the village of Syracuse, on terms such as would enable him to attend school, complete his education, and make a living for himself; that he desired to

accept this offer, and his mother was willing he should do so for his own good, but his stepfather insisted that he could not get along without him, and, in requesting plaintiff to remain with him, promised plaintiff and his mother that, if he would remain upon the farm and help him as he had theretofore done until he should reach the age of 21 years, he would then give him a team, harness and wagon to enable him to begin farming for himself, and that plaintiff should share equally with his own children, who are defendants herein, in whatever property he should have at the time of his death; that, relying upon this agreement, the plaintiff gave up the employment mentioned, and continued to work on the farm with and for his stepfather without wages; that from that time on plaintiff did a large part of the management and work of the farm until he was nearly 22 years old, at which time his stepfather gave him a team, harness and wagon according to the terms of his agreement, and in part fulfilment of his contract; that thereafter, and up to the time of his death, his stepfather continued to rely upon the plaintiff for assistance and advice, and frequently expressed to him and to others his regard for plaintiff as his own son, and his intention to so treat him in the division of his property at the time of his death; that their relations and mutual obligations to each other and his stepfather's dependence upon him formed a part of the inducements for making the agreement set out and the consideration therefor. The petition further alleged that the property left by John A. Wendeln at the time of his death was largely accumulated as a result of the labor and assistance given him by plaintiff in the early times when the land to which they had come and the country where they lived was new. Full and complete performance was alleged on the part of plaintiff, together with a failure to perform on the part of the deceased. Plaintiff prayed for specific performance of the contract, and a decree setting apart to him one-fourth of the assets of the estate, and for general equitable relief.

John F. Wendeln, Anna S. Wendeln and Metha Juilfs, together with Theodore Frerichs, the executor of the estate of the deceased, are the defendants. By their answers they deny both generally and specifically all of the allegations of the petition. They further plead the statute of frauds, in that no writing of any kind was ever made or signed evidencing any such contract, and allege want of consideration. It is further alleged by the answers that all of the property in question above the amount and value of $1,200 was accumulated by the defendants and their father after plaintiff became of age; and that the team, harness and wagon mentioned in the plaintiff's petition were given to him by his stepfather as an act of kindness, gratuitously performed, to aid the plaintiff in starting in life for himself. The reply admits that there was no writing evidencing the contract alleged, but denies each and every other allegation contained in the answers.

An examination of the record discloses that there is no controversy as to the following facts: John A. Wendeln died in Otoe county, Nebraska, in July, 1906, leaving an estate, consisting of real and personal property, of the value of $25,000, incumbered by an indebtedness of $1,008; that the defendants John F. Wendeln, Anna S. Wendeln and Metha Juilfs are the children of John A. Wendeln and his wife, the plaintiff's mother, and therefore the plaintiff is the stepson of the deceased, and half brother of the above named defendants; that the plaintiff was born in the year 1862 in the village of Etzel, Germany, and bears his mother's maiden name, she being unmarried at the time of his birth; that the defendants above named, together with Theodore Frerichs, the executor of the estate, are the only persons interested therein; that by the last will and testament of John A. Wendeln division of his property was made among his own children, with a legacy of $300 only to the plaintiff; that plaintiff's mother and John A. Wendeln were married in May, 1871, in Etzel, Germany, when the plaintiff was nine years of age, and, together with plaintiff, removed immediately to Otoe

county, Nebraska; that plaintiff remained in the family of his mother and stepfather, and worked upon the farm where they lived, without wages, until he became of age, and after that time he received from his stepfather a team, harness and wagon, as alleged in the petition.

It further appears that the only question about which there is any serious controversy is whether or not the contract relied on by the plaintiff was made as stated in his petition. The evidence on that question is, in substance, as follows: One William Kronsbein testified in effect that about the first of June, 1878, he made a trip with John Wendeln, his brother Herman, and the plaintiff to the village of Syracuse; that while there he heard Mr. Green, who was the proprietor of a drug store in that village, offer the plaintiff a place in his store. The witness said: "I heard all this talk in the drug store, and I told John Wendeln on the street that Harm (meaning the plaintiff) was going to leave, and that was all that was said at first. And then on the road John commenced talking to Harm. He says, 'Well, Harm, Bill told me you was going to leave.' 'Well,' Harm says, 'Yes, I am going to work for Green.' The old man says, 'Harm, if you leave me I am lost'; and then he made the agreement with him. He says, 'I give you a team, wagon and harness, and start you out, if you stay with me until 21 years old.' And I told him, 'It is better to write it out in black and white.' And John says, 'That ain't necessary, we got two witnesses. You be a witness and my brother Herman.' That was all that was said at first. Then we crossed the creek, and on the other side he says, 'Well,' he says, 'I do better, Harm. If you stay with me, and work like you always did, you get the same as them other children. You are my boy, as good as them others.' That was all that was said on the road. Now, the next morning, well, he says that Harm would stay. He told his wife just the same as he told it on the road. And George Wilke asked me if he made that agreement with Harm about the wagon and harness and the rest, and I told him, 'Yes.' * * * And John Wendeln

come in himself, and we talked it over, and he says, now Harm was going to stay just the same, team, wagon and harness and his share."

A witness by the name of Fritz Pahde testified that subsequent to the year 1878 he had a talk with John A. Wendeln, in which the witness said: "This Harm ain't your boy." And Wendeln replied: "Yes, it is my boy, even if I am stepfather to him. I call him my boy anyhow." " 'Well,' he says, 'I call him my boy, and he is just as good as any of my other children.' He says, 'Whenever he is around he is just as any of the rest of them, and he will get just as much as any of the rest of them.' "

One John Badberg testified that he had a talk with Wendeln about Harm Hespin. He said: "He told me, 'That boy works hard, and I couldn't get along without him.' And he says, 'I never forget him; when I get good luck, and something left when I die, he gets his part just as the other ones.' "

John Henrichs testified that, in a conversation with the deceased about Harm Hespin, the deceased said: "He wanted Harm to live there yet, and Harm was a good boy, he treat him all the time good, and Harm get his share just the same as other people. That is what he told me." On cross-examination the witness said: "Well, he told me that Harm was a good boy, and he like to give him just the same as them other ones."

The plaintiff was himself permitted to testify over objections, in substance, as follows: "I heard a conversation between my father and my mother. Father told her I was going to leave home, and that they couldn't spare me. He said, 'I have made Harm an offer, and I think it is good enough. It is the best I can do. What do you think about it?' She says, 'What is it?' He says, 'I have offered him a team, harness and wagon, and if he will stay until he is 21, and if there is any property after you and me are dead and gone, I told him he could have an equal share with the rest of the childen.' Mother then came to me and talked to me, and said, 'Harm, we can't very well get along

without you. We are now making money, making good headway, and I think father has offered you a good thing here. I would like to have you stay with us.' And I says, 'All right, I will do so.'" The plaintiff also testified,.over objections, that he heard a conversation between one Stromer and his stepfather as follows: "Mr. Stromer was standing on the sidewalk in there, and drank a glass of beer.' We generally drank a glass of beer when we went to town. We walked up to him, and Mr. Stromer says, 'Are you sick, John.' Father says, 'Yes, I am not feeling well.' 'Well,' he says, 'John, why don't you quit work. You don't have to work, you got plenty.' 'No,' father says, 'I got to work. I have got to get some more.' Stromer says, 'You have got those three children, you got enough for them.' Father says, 'No, I have got four children. This boy is just the same as the rest of my children, and after I die he gets the same as the rest of my children.' That was the conversation."

It appears that the trial court refused to consider this testimony because he thought it was incompetent. However, in addition to the evidence above set forth, there were several facts and circumstances testified to by other witnesses which tended in a measure to corroborate the evidence of Mr. Kronsbein as to the making of the contract in question, and there is nothing in the record which shows or tends to show that the foregoing testimony was false or unreliable in any particular. As shown by the record, nearly all of the witnesses were Germans, and, although they could not speak the English language correctly, yet their evidence bears the stamp of truth, and is convincing in its effect. We are therefore of opinion that it meets the requirement of the rule that to establish such a contract the evidence must be clear and satisfactory.

In *Kofka v. Rosicky*, 41 Neb. 328, 25 L. R. A. 207, it appeared that a girl about 17 months old was given by her parents to her uncle and aunt under an agreement that they would adopt her and rear, nurture and educate her; that she was to be as their own child, and at their death

she was to receive or be left all the property which they might own. She lived with them until they died some 10 years afterward, took their name, did not recognize or know her own father or mother in the true relation, but knew them as, and called them, uncle and aunt, and knew and recognized her uncle and aunt as father and mother. They died possessed of real estate in the city of Omaha which they did not by will leave to her. It was held that she was entitled to a decree giving her the title to the property by way of specific performance of the contract.

In *Harrison v. Harrison*, 80 Neb. 103, it appeared that one James Harrison owned a quarter section of land in York county, Nebraska; that he was a widower, and the father of William A., Hattie E., and Frederick J. Harrison; that in the spring of 1893 the father and Frederick J. moved upon the farm in York county, and lived there until 1898; that Frederick J. married, bringing his wife to the farm; that at the time they moved to the farm in question Frederick J. had a position in Denver, where he was doing well; that, in order to induce him to abandon his position and live with him upon the farm, the father agreed to give him the farm at the time of his death. After the father's death Frederick J. and his wife continued to live on the farm, and claimed to own the same by reason of his having complied with the terms of the agreement. Suit was brought by his brother and sister to quiet their title to two-thirds of the land and partition the same. It was held that, by having complied with the terms of the contract, Frederick J. became the owner of the land, and his contract was specifically enforced.

In *Peterson v. Bauer*, 83 Neb. 405, it appeared that one John H. Bauer adopted Sarah Matilda Nix when she was eight years of age under an agreement with her father that he would take her as his own child, care for her, school her, and at his death she should share his estate equally with his son. She lived with Bauer and his wife, was baptized in his name, faithfully performed the services of a daughter, and remained with them until she was

about 26 years of age, when, with Bauer's consent, she married a man by the name of Peterson. Bauer failed to carry out the agreement on his part, and after his death she brought an action for specific performance of the contract. It was held that she was entitled to recover one-half of Bauer's estate.

After a careful examination of the evidence we are satisfied that the facts of this case are brought well within the rule announced by the foregoing decisions. We therefore find that the contract in question was made in form and substance as alleged in the plaintiff's petition.

It is urged, however, that there was not sufficient performance on the part of plaintiff to take the contract out of the statute of frauds. We do not so view the evidence. The plaintiff in this case was not bound to live with, or render any services to, his stepfather. He was at liberty, if he saw fit, to abandon the home and seek employment and advancement elsewhere. It appears, however, that he lived with the deceased as a member of his family, and performed all the duties of a son; that his stepfather relied on him in a large measure to manage his business; that the plaintiff worked on the farm and contributed materially to the accumulation of the property in question; that, in consideration of the agreement, he refrained from entering a congenial and profitable employment, one in which he could have obtained a business education, and which offered him every opportunity for material advancement; that he practically carried on the work of the farm until he was 21 years of age; that, after the death of his mother, he returned again to live with, and assist, his stepfather, who insisted that he could not get along without him, where he remained for about a year. In fact, we are unable to see what more the plaintiff could have done to have fully performed the agreement in question on his part.

We therefore find upon the issues joined generally for the plaintiff, and that he is entitled to a specific performance of the contract, as prayed for by his petition.

The judgment of the district court is therefore reversed and the cause is remanded, with directions to that court to enter a decree in favor of the plaintiff, as prayed for in his petition, and in accordance with the views expressed in this opinion.

REVERSED.

ROOT, J., not voting.

LETTON and FAWCETT, JJ., not sitting.