CHARLES O'CONNOR, APPELLEE, V. MICHAEL WATERS,
ADMINISTRATOR, ET AL., APPELLANTS.

FILED JANUARY 9, 1911. No. 16,243.

1. **Specific Performance:** EVIDENCE. The direct, clear and uncontra-
   dicted testimony of two disinterested witnesses to the effect that
   a father, subsequent to his son's majority, promised that if the
   son would remain at home and care for his parents during their
   natural life he should have a definitely described tract of real
   estate, and testimony that the son for over 20 years, and up to the
   time his parents departed this life, performed his agreement,
   may, if believed by the court, support a decree for the specific
   performance of that contract.

2. **Appeal:** DEFENSE NOT RAISED BELOW. In such a case, if the other
   children claim the real estate under their father's will, but do not
   plead that the farm was their ancestor's homestead at the time the
   contract was made, and no such issue is tried in the district court,
   the defendants will not be heard in this court to urge that
   defense.

APPEAL from the district court for Dakota county:
GUY T. GRAVES, JUDGE. *Affirmed.*

*Sullivan & Griffin, Alfred Pizey, F. S. Berry* and *M. C.
Beck,* for appellants.

*J. J. McAllister* and *R. E. Evans, contra.*

ROOT, J.

This is an action to enforce the specific performance of
an oral contract, by the terms of which Patrick O'Connor
agreed to convey or devise to his son, the plaintiff, a
quarter section of land in Dakota county. The plaintiff
prevailed, and the defendants appeal.

It appears that in 1879, Patrick O'Connor, now de-
ceased, in company with his wife and seven children,
came to Dakota county, and two years subsequently ac-
quired title to the land in controversy. Patrick O'Con-
nor's four daughters remained at home until they entered

the marriage relation, but the sons, Morris and John, and Charles, the plaintiff, did not marry. Patrick O'Connor made some inconsiderable provision for his daughters when they married, and in 1897, shortly before his wife died, conveyed a farm to his son Morris. The plaintiff was born in 1862, and has lived upon the land in controversy since his father acquired title thereto. Patrick O'Connor was a successful breeder of and dealer in live stock. While the testimony is conflicting, it fairly appears therefrom that Charles O'Connor was industrious and a successful farmer, and that he worked upon the home farm, assisted in caring for his father's live stock, cultivated rented farms, and superintended the men hired to assist in the farm work. So far as we are advised, the profits growing out of the sale of the crops and the live stock grown upon these farms were received by Patrick O'Connor. In short, if the testimony correctly portrays the facts, Charles O'Connor, before his father's death, received little other than five horses, his support, and a fairly generous supply of spending money in return for the services rendered by him since he attained his majority in 1883.

Morris O'Connor, the plaintiff's brother, testified in substance that he departed from home to work for himself, but returned in 1884 and remained until 1897, upon his father's promise to purchase the witness a farm if he would work and help pay for it, which was done. Morris also testifies: "He (his father) told me right in front of Charlie, right in front of the barn door, that the home place would be Charlie's; that he had made an agreement that he was to stay on the place and take care of him and my mother, until they were through with the place; when they died the place would be his; and if I stayed home and helped him to pay for another place he would buy one for me." This testimony is clear, direct and certain that the promise was made. No one contradicts the testimony. Possibly no one other than the plaintiff could deny it, but if Morris O'Connor should be believed,

18

the deceased admitted the obligation pleaded in the petition.

The witness Hartnett was called and testified as a witness for both sides of this controversy. Hartnett testifies to a conversation with Patrick O'Connor in 1897, after Mrs. O'Connor's death, as follows: "I asked him (Patrick O'Connor), I says, 'Charlie wanted me to ask you what you was going to do for him,' and he says, 'I will give him this place at my death; I promised Charlie O'Connor's mother on her death bed that this should be his place, and I shall keep my promise, and, in case I do not do it, I want you, John Hartnett, to remember that I have to give it to him.' And Charlie says, 'What will I have to show for that?' He says, 'You have John Hartnett for a witness that I promised you.'" This testimony not only corroborates Morris O'Connor, but leaves the impression that Patrick O'Connor did not propose to reduce his promise to writing, and that his wife for some reason feared he would not fulfil his obligation. Possibly Charles O'Connor was his mother's favorite child; he had performed his part of the contract for 14 years, and his mother's concern lest her husband might repudiate that contract is convincing evidence that it actually was made.

Seven other witnesses testified to Patrick O'Connor's repeated declarations that the plaintiff should have the farm when the declarant died. Many of these statements are testamentary in character, but some of them indicate that O'Connor recognized a contractual obligation on his part to devise or convey the farm to the plaintiff. There are circumstances tending to discredit some of these witnesses, but the witness Hartnett appears to be above reproach. Morris and his sister, Annie Mullin, refused to defend this action; it is contested by the other three sisters and the son John.

Patrick O'Connor died in December, 1905, and five days before dissolution executed a will, which has been duly probated, whereby $500 is bequeathed to the plaintiff, and

*O'Connor v. Waters.*

various other sums, aggregating $5,600, are bequeathed to the other children and for charity.   The testator charged the draughtsman of the will not to permit the plaintiff to know its contents until subsequent to the testator's death.   The defendants brought forward witnesses who testified in effect that the testator had frequently declared that he would divide his estate in equal shares between the plaintiff and his sister Mary, and she testifies to a conversation between the testator, the plaintiff, Morris O'Connor, Mrs. Mullin, and the witness, in 1897, wherein her father said in effect that he intended to and would divide his estate equally between the witness and the plaintiff after the other daughters and the son John had been provided for.   The witness gave two different and contradictory versions of this conversation, and there are facts and circumstances appearing in the record which tend in some degree to detract from her credit.   Mrs. Mullin practically contradicts her sister, and Morris flatly denies that any such statements were made.

In view of the fact that two disinterested witnesses have testified in clear and certain terms to the admissions of the deceased that he had agreed to transfer the farm to the plaintiff, corroborated as they are by seven other witnesses, we shall find that the promise was made.   The evidence is wholly inadequate to justify a belief that Patrick O'Connor repudiated his contract, unless the execution of his will five days before his death had that effect.   We do not question the right of a parent to repudiate, or a court of equity to cancel, a contract, whereby a parent, in consideration for his support, conveys his home, or agrees to convey his home, to a child or to a stranger, and subsequently the grantee or promisee fails reasonably to fulfil his part of the contract.   But Patrick O'Connor made no complaint of the plaintiff's conduct.

The next inquiry is whether there was such performance on the part of the plaintiff as to justify a judgment

of specific performance. The trial court rigidly excluded all of the plaintiff's own testimony tending to show that performance or negativing the payment of compensation for the services rendered his father during the 22 years succeeding the witness' majority. Notwithstanding this fact, there is a mass of testimony tending strongly to prove that during all those years the plaintiff was the mainstay of his father's business, and that the elder man received practically all of the fruits of his son's labor and skill. We feel justified in finding that those benefits were bestowed by the plaintiff in reliance upon his father's promise, and that it is difficult, if not impossible, to fix their value. Furthermore, by remaining at home, the plaintiff yielded whatever advantage might have come to him by engaging in business on his own account; that he might have signally failed does not detract from the value of the consideration involved in the waiver of his opportunity.

We agree with the defendants' counsel that courts look with suspicion upon claims of this character brought forward, as they generally are, after death has closed the lips of one party thereto. On the other hand, the parties not infrequently are unacquainted with the character of evidence demanded by the law to establish beyond controversy a contract affecting title to real estate, and where the arrangement is between parent and child, the younger person generally has no thought that the elder will not redeem his promise. The court, in its desire to do justice between the conflicting claimants, should not lose sight of the difficulties under which the living, as well as the representatives of the dead, labor, but should carefully examine the testimony in the light of the circumstances surrounding the parties, should consider their education and prejudices, should attempt to think as they probably thought, and, after weighing all the facts and circumstances brought to its attention by the evidence, find whether the plaintiff and the other party to the alleged contract did enter into an agreement, and, if so,

whether it was substantially performed on the plaintiff's part. This we have attempted to do, and, after a mature consideration of the evidence, find that the contract was made substantially as alleged, and that the plaintiff should have the relief prayed for in his petition. *Kofka v. Rosicky*, 41 Neb. 328; *Harrison v. Harrison*, 80 Neb. 103; *Peterson v. Bauer*, 83 Neb. 405; *Hespin v. Wendeln*, 85 Neb. 172.

The defendants argue that, since the real estate constituted the homestead of Patrick O'Connor and his wife at the time the contract was made, it should be given no effect so far as that estate is concerned, and the decree of the district court should at least be modified. No such an issue is joined by the pleadings, nor was that defense tried in the district court, and we are of opinion it has been waived.

Upon the entire record we find that the judgment of the district court is right, and it is

AFFIRMED.

REESE, C. J., not sitting.