BESSIE LACEY, APPELLEE, V. CHAUNCEY D. ZEIGLER ET AL., APPELLANTS.

FILED MAY 14, 1915. No. 18084.

1. **Courts: JURISDICTION: POWER OF LEGISLATURE.** Section 9, art. VI of the Constitution, confers on the district courts "both chancery and common law jurisdiction, and such other jurisdiction as the legislature may provide." The equitable jurisdiction of the district courts is, therefore, beyond the power of the legislature to limit or control. While it may grant such other jurisdiction as it may deem proper, it cannot limit or take from such courts their broad

Lacey v. Zeigler.

and general jurisdiction which the constitution has conferred upon them.

2. **Wills:** ORAL CONTRACT: SPECIFIC PERFORMANCE. Where a party orally contracts to devise and bequeath to another certain real estate and money in consideration that the beneficiary shall assume a peculiar and domestic relation to the promisor, and render him services of a character to make it practically impossible to estimate their value by any pecuniary standard, and the beneficiary, in reliance upon the oral promise, in good faith assumes the relation and fully performs her part of the agreement, she will be entitled, in the event of a breach of the contract by the promisor, to a specific performance of the same as made.

3. **Specific Performance:** JURISDICTION: CONTRACT TO DEVISE. And when such contract and relation are established under a single and indivisible contract, and the promisor dies without having complied with the terms of his promise, the county court is without, and the district court has, jurisdiction of an action for the specific performance of such contract.

4. ——: ——: ——. Where a court of equity can afford complete and adequate relief and by one litigation and decree adjudicate the rights of the parties, it may take jurisdiction over the entire subject matter and order a specific performance of the entire contract.

5. ——: ——: ——: CERTIFICATION TO COUNTY COURT. And in such case, where it appears that the estate of the decedent promisor is solvent, it may certify its finding to the county court as to the amount which it has found due from the estate and direct that the same be allowed as an established claim against such estate.

6. **Wills:** CONTRACT TO DEVISE: SUFFICIENCY OF EVIDENCE. The evidence examined, and set out in the opinion, *held* sufficient to establish an indivisible contract on the part of defendants' decedent, for a single consideration on the part of plaintiff, consisting of unusual personal services performed by her for said decedent.

APPEAL from the district court for Platte county: GEORGE H. THOMAS, JUDGE. *Affirmed.*

*A. M. Post* and *M. Whitmoyer,* for appellants.

*Reeder & Lightner, contra.*

FAWCETT, J.

From a decree of the district court for Platte county, awarding plaintiff specific performance of an alleged parol

agreement, by the terms of which Charles W. Zeigler agreed that he would at his death leave or give to plaintiff the sum of $5,000 in money and the home place in the city of Columbus, Nebraska, known as lots 5, 6, 7 and 8, in block 16, Gerrard's addition to that city, together with all household furniture and furnishings therein, in consideration that plaintiff would abandon any contract or claim she then had for past services, and would devote her time and attention to caring for and nursing said Zeigler, and to keeping house for him, so long as he should live, defendants appeal.

The above statement contains, substantially, the allegations in the petition as to the contract upon which plaintiff relies. She then alleges compliance on her part with the terms of the contract. Mr. Zeigler died without keeping his part of the agreement. Defendant Webster is the administrator of his estate, and the other defendants are brothers and sisters and children of a deceased sister of the decedent Zeigler. The substance of the answer of the defendant Webster, administrator, is that he admits the plaintiff performed services for the decedent and his wife within the period of three years preceding his death; that deceased left an estate of the value of about $60,000; that he is informed that his codefendants deny the rights asserted by plaintiff in her petition; that he is without knowledge as to the allegations of the petition, and therefore denies the same. The answering heirs allege, substantially, that the services rendered by plaintiff for the decedent, which formed the basis for the claim, if any, which plaintiff had, and which she alleges she abandoned at the time she made the parol agreement under which she seeks to recover, were rendered for plaintiff and one Edward A. Gerrard, a copartnership. They admit that plaintiff rendered service, under the direction of the decedent, as a nurse for his wife in her last illness and in nursing and caring for the decedent himself in his last illness; admit that they claim the entire estate of the decedent by virtue of the laws of descent of this state; admit that plaintiff is in possession of the home place above referred to, but

allege that such possession was acquired by fraud of plaintiff after the death of Mr. Zeigler, and is being maintained by force without authority of law.  As to the contract relied upon by plaintiff, they allege that there is no note or memorandum in writing signed by the decedent or by any of the defendants; that the estate is solvent, and that the administrator and the several heirs are willing and anxious that plaintiff shall be amply compensated by said estate for all services rendered by her on account of the decedent or his wife, "and they hereby offer to pay and satisfy her lawful claims of every nature therefor."  They then charge that by means of improper relations between plaintiff and decedent she acquired and exercised an undue influence over him, whereby she was enabled to and did dictate and control his actions in affairs of business; that early in or previous to 1909, and thereafter until his death, the decedent was afflicted with a mental disorder which greatly impaired and finally destroyed his power of mind, during which time he was under the influence and control of plaintiff, and if any promise was made by him to plaintiff, of the nature alleged by her, it was so made during the period of his aforesaid mental derangement, and was procured by means of plaintiff's undue influence and control, "and is unconscionable, illegal and void."  They pray "that plaintiff's petition may be dismissed, and that they recover their costs herein expended, and for a decree quieting and confirming their title to the real property in said petition described as against the plaintiff and all parties claiming through or under her."  The reply is a general denial.  The court found generally for the plaintiff, quieted and confirmed her title as against the defendants to the real estate, and further ordered that defendant Webster, as administrator, pay to plaintiff from the assets of the estate the sum of $5,390, with interest from January 25, 1913, and costs; that a copy of the decree be certified by the clerk to the county court of Platte county, "wherein the said sum of $5,390, together with interest thereon from this date and costs of this suit, shall have the effect

of an established claim against the estate of said deceased."

The brief assigns eight specific errors for reversal, the second being that the judgment is unsupported by the evidence, and the seventh that the district court exceeded its power in allowing plaintiff's claim of $5,000 and interest, and assuming to distribute funds in the hands of the administrator and within the exclusive jurisdiction of the county court. A consideration of these two assignments involves sufficient of the record to dispose of the other six.

The witness Selzer testified that he had known decedent for 30 years and plaintiff since 1891; had worked on the ranch referred to during the last 21 years that it was operated; that, after the ranch was discontinued, decedent said he was going to move down to Columbus and have plaintiff keep house for him; "That he was going to give her this home property and $5,000. * * * Q. What was she to do for that? A. Maintain this house and take care of him." That plaintiff remained with and kept house for decedent until the time of his death, October 14, 1911; that decedent said he had never given plaintiff any money or paid her anything; that she had been responsible for his accumulating property; that he never had as good success as he had now. He further testified that the agreement to give plaintiff the home place and $5,000 in money was talked over by decedent in plaintiff's presence while they and the witness were "eating at the table, all three of us, after we moved down here;" that decedent told him he had traded off a house, which belonged to plaintiff, for lumber to put into his new house, and that he received $850 for it.

Mrs. Elizabeth Schmid testified that she was acquainted with the parties; that decedent sold off the stock on the ranch and moved to Columbus in 1909, after the death of his wife; that plaintiff went to Columbus and lived at the Zeigler residence thereafter; that she did the housework and cooking; took care of decedent and nursed him all through his sickness; that she (witness) frequently visited at the Zeigler home after plaintiff and Zeigler

moved there; that she was there just a week before Christmas, 1909; that at that time decedent seemed in good health; that she did not see anything wrong with him at all; that he then said that plaintiff was a good housekeeper and a good cook, and that he was going to "give her this house and property and $5,000 in cash.   *   *   *   He said the house and furniture and the lots.   *   *   *   Q. Did he say anything about what Miss Lacey (plaintiff) was to do in order to get this property? A. Why, to keep house and take care of him. Q. For how long? A. Until he died.   Q.   Do you know whether or not Miss Lacey did take care of him until he died? A. I do; she did. Q. Do you know, Mrs. Schmid, anything about how troublesome it was to take care of him during the last few months of his sickness? A. I do. Q. Just describe it to the court. A. I tell you I wouldn't stay there and take care of that man the way he is.   *   *   *   He was sick and he got nervous spells, and then she would have to go and put water on his head and doctor him like you would a sick person. Q. His mind wandered? A. Yes, sir. Q. Was he able to take care of himself during the last few months? A. No, sir."

Dan J. Echols testified that he knew decedent in his lifetime; knew the place where he lived in town; that in 1910 decedent told him that plaintiff had worked for him a number of years; had done her work well and was one of the best women to work he had ever known; that when he died he intended to name her in his will and give her $5,000 and the home place; that she was going to stay with him until he died.

Jacob Schmid testified that decedent talked to him about plaintiff, and said "he intended Miss Lacey to have $5,000 and the home place;" that at the time decedent told him that "we was washing him off, tending to his arms, and Miss Lacey went into the kitchen, and he told me that, and when he told me that he said she is an awful good woman;" that plaintiff remained at Zeigler's home until his death.

Lacey v. Zeigler.

Mrs. Isabell Webber testified that she was well acquainted with the decedent, and was acquainted with plaintiff; that she was at the home in Columbus in April, 1910, when she heard he had been hurt in an automobile wreck, and stopped to see how he was; that decedent's health seemed pretty good, except that he had quite a serious breaking out on his arm; that on different times during the day or night she assisted in taking care of him by putting applications on his arm; that during that time decedent talked with her about plaintiff. "Q. What did he say about that—about what he had agreed to give Miss Lacey? A. Why, he said that he had agreed to give her $5,000, and after he came to town he was going to give her the home place and all of its belongings if she would stay with him until he got well, and if he got over his ailments he was going to give her $10,000 or better. He said, 'I have always agreed to give her $5,000, and I told her,' he says, 'if she will take good care of me as long as there is anything the matter with me I will give her $10,000.' Q. You say he told you he had agreed to give her $5,000 and the home place. Did he say that? A. Yes, sir. * * * Q. Did he say anything about whether or not he had paid her for her services on the ranch for taking care of him? A. He said he had never paid her anything, but had always used her money; used what she should have had to make money with; that she had also sold her house, and he had the money for that. Q. Did he mention that at this time? A. Yes; he mentioned that at the same time; that he had sold her property in town, and he had used the money. Q. Did he say whether or not he had told Miss Lacey of what he intended to do for her? A. Yes, sir. Q. What did he say about that? A. He said that he had promised her $5,000 and the home place, there. Q. He said he had told her that? A. He had told her that, and that he was going to make it $10,000 if she would stay and take care of him, but for me not to tell that part of it; he had already told her the other; he said that nobody else could take care of him as she did. Q. Just one other question, did he say anything about whether this arrangement

Lacey v. Zeigler.

between him and Miss Lacey was in writing or not? A. No; it wasn't in writing; he said she knew that his word was good. Q. How is that? A. He said it wasn't in writing, but she knew his word was good, and he intended to put in some shape to make it so it would be good so she wouldn't have any trouble getting it if he should happen to drop off."

Fred Elias testified that decedent had told him he had received $800 for plaintiff's house, which he traded to lumbermen for lumber to go into his own new house.

The above testimony stands uncontradicted and unimpeached. It is strengthened by the admission in the answer of defendants that plaintiff rendered service under the direction of the decedent as a nurse for his wife in her last illness, and in nursing and taking care of the decedent himself in his last illness; and that they are willing and anxious that plaintiff should be amply compensated for all services rendered by her on account of the decedent or his wife. Mr. and Mrs. Zeigler died childless. The defendants are brothers and sisters and children of a deceased sister, all nonresidents of Nebraska during the time of the illness of Mr. and Mrs. Zeigler. Plaintiff in the hour of decedent's need was the one to whom he turned for services of a character which would have been hard to secure from strangers. The testimony of these witnesses clearly shows that she was faithful at every point; that she rendered services, the value of which it would be impossible to estimate in dollars and cents. Decedent knew plaintiff. She had been in his employ for 18 years at the ranch before he brought her to Columbus. He knew the kind of housekeeper and cook she was, and understood more than anyone else the character of the services which she would be able to render. He fixed the value of those services at $5,000 and the home place in Columbus. He was worth, as alleged in the petition, $80,000, and, as admitted by the administrator in his answer, about $60,000. Under such circumstances we certainly cannot say that the court erred in sustaining the value which decedent himself placed upon those services. We think the evidence

is ample to sustain the contract. The evidence to support the judgment is fully as strong, if not stronger, than that shown in *Kofka v. Rosicky*, 41 Neb. 328, *Harrison v. Harrison*, 80 Neb. 103, *Peterson v. Bauer*, 83 Neb. 405, *Hespin v. Wendeln*, 85 Neb. 172, and *O'Connor v. Waters*, 88 Neb. 224.

The question raised by the seventh assignment of error is not so difficult of solution as it might at first appear. Section 16, art. VI of the Constitution, provides: "County courts shall be courts of record, and shall have original jurisdiction in all matters of probate, settlements of estates of deceased persons, appointments of guardians, and settlement of their accounts; in all matters relating to apprentices; and such other jurisdiction as may be given by the general law. But they shall not have jurisdiction * * * in actions in which title to real estate is sought to be recovered, or may be drawn in question." It is urged by defendants that the district court was without jurisdiction to render judgment against the administrator on account of services rendered for deceased for the amount of the money consideration to be paid therefor, and directing such judgment to operate "as an established claim against the estate of said deceased," and that the judgment to that extent is therefore void. It is argued that the county court is alone invested with the jurisdiction to determine such a matter; that the county court in this instance had actually acquired jurisdiction of the *res* by the appointment of the administrator. A number of decisions of this court are referred to in support of this contention. An examination of the cases cited will show that none of them is applicable to a case like the one under consideration. We have repeatedly held that the county court is the court of original jurisdiction in which claims against decedents' estates must be filed and adjudicated, but it will be found in every such case that there was involved a separate and distinct matter which the county court could in the exercise of its jurisdiction dispose of in its entirety. We have never held that where the matter involved is a single contract on the part of a claimant for

a consideration payable partly in money and partly by con-
veyance of real estate, the claimant must appeal to the
county court for an enforcement of part of his contract
and to the district court for an enforcement of the other
part.   That the district court alone could determine the
contract sued upon in this case, so far as it applied to the
real estate, is of course conceded.   Having obtained juris-
diction for that purpose, then, under equally numerous
decisions of this court, it has the power to retain it for all
purposes.   To hold otherwise, would be to encourage a
multiplicity of suits and to require plaintiff in this case
to commence her suit in equity in the district court to
recover part of the consideration which she was to receive
for the single agreement made and service rendered there-
under on her part, and file her claim in the county court
for the other part of that consideration.   This would
have entailed upon her the expense of two trials, in sepa-
rate courts, to establish the same fact, with the uncer-
tainty that those courts would reach the same conclusion.
Section 9, art. VI of the Constitution, provides:   "The
district courts shall have both chancery and common law
jurisdiction, and such other jurisdiction as the legislature
may provide."   The equitable jurisdiction of the district
court is therefore beyond the power of the legislature to
limit or control.   It may give the district court "such
other jurisdiction" as it may deem proper, but it cannot
take away from such court its broad and general jurisdic-
tion in chancery which the constitution has conferred up-
on it.   We are not without authority to sustain us in
this conclusion.   In *Gilliam v. Chancellor & Murray*, 43
Miss. 437, it is held: "Where the chancery court can af-
ford complete and adequate remedy, and, by one litigation
and decree, adjudicate the rights of the parties, it may
take jurisdiction over the entire subject matter, and if
necessary, enjoin a party from proceeding in a suit in the
probate court, when such suit only embraces part of the
subject."   In the opinion (p. 448) it is said:   "Three im-
portant points are made by counsel:   First, whether as
claimed for the plaintiff in error, the jurisdiction of the

probate court, over the bequest to Mr. Gilliam is exclusive." In discussing this point the court say: "The argument is, that Mrs. Gilliam had instituted the proceeding in the probate court, against the executors to secure the legacy of $5,000; a tribunal which had, to the exclusion of the chancery court, jurisdiction to order its payment, and it was therefore an usurpation in the chancery court to stay that suit by injunction, and to withdraw from it, to itself, the subject matter in dispute. It was declared in *Blanton v. King*, 2 How. (Miss.) 856, and *Carmichael v. Browder*, 3 How. (Miss.) 252, followed by a long train of subsequent adjudications, that the jurisdiction conferred by the constitution on the probate court, was exclusive; so exclusive that the chancery court was ousted of cognizance over a large class of subjects which theretofore belonged to it. From 1832 to 1860, our books are full of cases attempting to define the boundary which separated the two courts. In truth, no subject has so much perplexed and embarrassed the appellate court as this. The chancery had unquestionably the cognizance of the rights of Mrs. Gilliam under the marriage contract, and would draw to itself all collateral subjects necessary and proper to be considered in order to a full, complete, and final adjudication of those rights. * * * The powers and jurisdiction of the chancery court were broader, more pliant, and flexible in its modes of redress, fully competent in one litigation, to adjudicate finally in respect to both the settlement and bequest, and could, therefore, well assume, as it did, entire cognizance over the subjects."

Doubtless, other authorities could be found, but the proposition appears to us so plain that we have not made further search therefor. We therefore hold that the district court had jurisdiction to hear and determine the controversy between the parties, in its entirety.

It was within its jurisdiction to order specific performance of the contract as to the money part of the consideration, to advise the county court, by the certificate which it ordered its clerk to send to that court, of the finding of the district court as to the amount which it had found due

plaintiff from the estate, which is concededly solvent, and to direct that the same be allowed as an established claim against the estate.

We deem it unnecessary to consider the assignment that the decedent was mentally incompetent, as there is an entire failure of evidence to show that his mental incompetency existed at the time he made his contract with plaintiff. At that time, and for many months thereafter, he was transacting his business as usual, and was clearly not in such mental condition as to render him incompetent to make a contract of the kind set out. Nor do we think there is any merit in the assignment that the service proved was not referable to any contract alleged. The fifth assignment, under which the defendants seek to cast a stain upon their brother, from whom they are inheriting this large estate which they did not help to earn, is not worthy of consideration. The proof utterly fails to establish it, and, even if it were established, that fact would not militate against the right of the decedent to make the contract alleged. The evidence fails to establish the sixth assignment, that the contract was the product of plaintiff's undue influence over decedent. The eighth assignment, that there was a defect of parties defendant, must fail, for the reason that it is immaterial that decedent may have been jointly interested with Mr. Gerrard in the ranch upon which plaintiff worked for 18 years before she rendered the services for which she now seeks to recover. We have limited our consideration to the services performed by plaintiff for decedent and his wife in the last illness of each. The amount which decedent agreed to pay plaintiff in money and property for those services was not, under the circumstances shown, "unconscionable." The compensation agreed to be paid for such services was not considered excessive by Mr. Zeigler, nor do we so consider it.

Finding no error in the record, the judgment of the district court is

AFFIRMED.

LETTON and ROSE, JJ., not sitting.