171 N.W.2d 156 (1969)
184 Neb. 621
STATE of Nebraska ex rel. Loren B. BELKER, Relator, Appellant,
v.
BOARD OF EDUCATIONAL LANDS AND FUNDS of the State of Nebraska et al., Appellees.
No. 37004.
Supreme Court of Nebraska.
October 3, 1969.
Ginsburg, Rosenberg, Ginsburg & Krivosha, R. P. Cathcart, Lincoln, for appellant.
Clarence A. H. Meyer, Atty. Gen., Bernard L. Packett, Asst. Atty. Gen., Lincoln, for appellees.
McGinley, Lane, Mueller, Shanahan & McQuillan, Ogallala, Maupin, Dent, Kay, Satterfield & Gatz, Gary L. Scritsmier, North Platte, for amicus curiae.
Heard before WHITE, C. J., BOSLAUGH, SPENCER, SMITH, McCOWN, and NEWTON, JJ., and COLWELL, District Judge.
PER CURIAM.
This action seeks to enjoin the sale of all of the school lands held in trust for and on behalf of the common schools of Nebraska, and to declare sections 72-257 and 72-258, R.S.Supp., 1967, and 72-258.01, R.R. S.1943 (as amended by Laws 1965, c. 435, ss. 2, 3, and 4, pp. 1386 and 1387, and Laws 1967, c. 466, ss. 10 and 11, p. 1450), void and unconstitutional.
Four judges are of the opinion that the statute is unconstitutional as challenged. Three judges are of the opinion that it is constitutional under present conditions, and refuse to consider the situation as it may appear in 1975 when approximately one-half of all school land leases will expire. Article V, section 2, Constitution of Nebraska, provides in part: "No legislative act shall be held unconstitutional except by concurrence of five judges."
The court is in agreement that the phrase "all mineral rights" in section 72-257, R.S.Supp., 1967, is declaratory of Article III, section 20, Constitution of Nebraska, and that the Legislature within constitutional limits may direct the Board but not a county treasurer to auction common school lands.
The district court dismissed the action herein. The judgment, under Article V, section 2, Constitution of Nebraska, must be affirmed.
Affirmed.
*157 SPENCER, J., joined by WHITE, C. J., NEWTON, J., and COLWELL, District Judge.
The real question at issue herein is whether the words "under the direction of the Legislature" grant to the Legislature the right to deprive the Board of Educational Lands and Funds of the State of Nebraska of all discretionary rights and duties of a trustee, including the responsibility to dispose of trust property on the most advantageous terms it is possible to secure.
Plaintiff is a citizen, resident, and taxpayer of the State of Nebraska and the parent of a child of school age residing with him in Nebraska who is a beneficiary of the trust created for the benefit of children of school age, and he brings this action in his own behalf and on behalf of all others similarly situated.
The petition herein had been presented to the Attorney General prior to its filing. The Attorney General denied the request of the petitioner and refused to file said action. On December 31, 1967, there was a total of 1,622,159.53 acres owned by the Board of Educational Lands and Funds of the State of Nebraska, hereinafter referred to as Board. Of that total, 1,621,061.58 acres were under lease. Since January 1, 1968, the Board had sold some of the lands and it was stipulated that it intends to continue selling school lands as the leases expire. In connection with the school lands sold at the expiration of their leases, the sum of $11,916.99 was expended between January 1, 1968, and March 25, 1968.
There were 294 leases which expired in 1968, and approximately 250 will expire each year until 1975, at which time approximately one-half of all the leases, with a present valuation of 75 million dollars, will expire. As of January 1965, the school lands had a value of $39,500,000. By December 1967, when a reappraisal of the school lands had commenced the value was $70,100,000. There is 15 million dollars in the permanent school fund, representing proceeds realized from sales over the years of 1,300,000 acres of school land. That 1,300,000 acres, if still owned by the state, would have an approximate valuation of 250 million dollars.
Testimony on behalf of the plaintiff that the volume of sales required by the act would depress the market and would lower the value of the individual tracts, and that the present source of available funds could not possibly support the sales when the majority of the leases expire, stands undisputed in this record. Plaintiff's expert witness testified that it would not be a prudent or a sound investment policy to sell all the real estate and to invest the proceeds in government bonds. This testimony also stands undisputed. Plaintiff's expert further testified that his organization at the present time was actively selling government bonds and was placing more emphasis on equity investments, such as real estate.
In order to understand the questions presented herein, it is necessary to examine the historical background of and the source of title to the school lands in Nebraska. On May 30, 1854, Congress approved an act for the purpose of organizing the territories of Nebraska and Kansas. Section 16 of that act, 10 Stat. at L., p. 283, is as follows: "And be it further enacted, That when the lands in the said Territory shall be surveyed under the direction of the government of the United States, preparatory to bringing the same into market, sections numbered sixteen and thirty-six in each township in said Territory shall be, and the same are hereby, reserved for the purpose of being applied to schools in said Territory, and in the States and Territories hereafter to be erected out of the same."
Nebraska became a state by virtue of an Enabling Act of Congress approved April 19, 1864. (13 Stat. at L., p. 47.) By the terms of this act, sections 16 and 36 of each township were granted to the state for the support of the common schools except in cases where sales had been made, in which event the state was granted other lands equivalent in area. Nebraska adopted a *158 Constitution within the territory in 1866, and was admitted into the Union on March 1, 1867. By its admission, it assumed the privileges and duties of statehood, including those imposed by the Enabling Act referred to above, which included the acceptance of the lands and funds for the common schools of the state.
The Constitution of Nebraska, 1866, contained the following provision: "The principal of all funds arising from the sale, or other disposition of lands or other property, granted or entrusted to this State for educational and religious purposes, shall forever be preserved inviolate and undiminished; and the income arising therefrom shall be faithfully applied to the specific objects of the original grants or appropriations. The Legislature shall make such provisions by taxation or otherwise, as, with the income arising from the school trust fund, will secure a thorough and efficient system of common schools throughout the State; but no religious sect or sects, shall ever have any exclusive right to, or control any part of the school funds of this State."
Sections 1, 2, and 3, of Article VIII, of the Constitution of Nebraska, 1875, which amended the Constitution of 1866 with regard to school lands and funds, their use and supervision, provided as follows: "Section 1. The governor, secretary of state, treasurer, attorney-general, and commissioner of public lands and buildings shall, under the direction of the legislature, constitute a board of commissioners for the sale, leasing, and general management of all lands and funds set apart for educational purposes, and for the investment of school funds in such manner as may be prescribed by law.
"Sec. 2. All lands, money, or other property granted, or bequeathed, or in any manner conveyed to this state for educational purposes, shall be used and expended in accordance with the terms of such grant, bequest, or conveyance.
"Sec. 3. The following are hereby declared to be perpetual funds for common school purposes, of which the annual interest or income only can be appropriated, towit: First. Such per centum as has been, or may hereafter be granted by congress on the sale of lands in this state. Second. All moneys arising from the sale or leasing of sections number sixteen and thirty-six in each township in this state, and the lands selected, or that may be selected in lieu thereof. Third. The proceeds of all lands that have been, or may hereafter be granted to this state, where, by the terms and conditions of such grant, the same are not to be otherwise appropriated. Fourth. The net proceeds of lands and other property and effects that may come to the state, by escheat or forfeiture, or from unclaimed dividends, or distributive shares of the estates of deceased persons. Fifth. All moneys, stocks, bonds, lands, and other property, now belonging to the common school fund."
Except for the composition of the board of commissioners, whose function is still the same, there has been no material change made with regard to school lands and funds since the Constitution of 1875.
Section 72-257, R.S.Supp., 1967, provides as follows: "All lands, now owned or hereafter acquired by the state for educational purposes, shall be sold at the expiration of the present leases. The Board of Educational Lands and Funds shall retain all mineral rights in the land sold. Prior to such sale, the land shall be appraised for sale purposes in the same manner as privately-owned land by a representative appointed by the Board of Educational Lands and Funds, and thereafter shall be sold at public sale at not less than the appraised value; Provided, that when two or more contiguous tracts within a section are under separate leases with different expiration dates, the board may, if it is deemed to be in the best interest of the state, defer the sale of any tract of one hundred sixty acres or less having an earlier lease expiration date, and may offer the tract for lease for less than twelve years to coincide with the expiring lease of the contiguous tract, in order that *159 the contiguous lands within a section may eventually be offered for sale on the same date."
Section 72-258, R.S.Supp., 1967, provides: "Such land shall be sold, at public auction, by a representative of the Board of Educational Lands and Funds or by the county treasurer of the county in which the land is located, to the highest bidder. The appraised value for sales purposes as provided in section 72-257 shall be the starting bid price. Notice of such sale and the time and place where the same will be held shall be given by publication three consecutive weeks in some legal newspaper published in the county where the tracts of land or the lots are located or, in case no legal newspaper is published in said county, then in some legal newspaper of general circulation therein. The proof of such publication shall be made by the affidavit of the publisher, foreman or principal clerk of such newspaper or by some other person knowing about the same, and shall be filed in the office of the Board of Educational Lands and Funds; Provided, when the land consists of an undivided interest in realty, an action to partition may be maintained in the same manner as provided by law for the partition of real property among several joint owners. All notices of sale shall be posted in the office of the Board of Educational Lands and Funds. The board may arrange for such commercial advertising of land sales as it deems in the best interest of the state. Settlement shall be made by paying cash of not less than twenty per cent of the purchase price at the time of sale and the balance shall be payable in cash within ninety days of the date of sale. If the person submitting the high bid for the land fails to pay the balance of the purchase price and complete the sale within ninety days his rights under the sale, including the twenty per cent down payment, shall be forfeited by the board and a new sale shall be authorized."
Section 72-258.01, R.R.S.1943, provides: "If such land should not be sold according to provisions of sections 72-208, 72-257, and 72-258, then it shall be offered for lease as the Board of Educational Lands and Funds shall provide for a period of six years. No such leased land shall be subsequently offered for sale until the expiration of such lease."
It is to be noted that all the school lands except mineral rights shall be sold at the expiration of their present leases, and if the land is sold at not less than the appraised value as determined by a representative appointed by the Board, the Board has no discretion as to the approval or the disapproval of the sale.
The provision of the Enabling Act making the grant, the Constitution of 1866 setting apart and pledging the principal and income from such grant, and the subsequent act admitting the state into the Union under such Constitution, constitute a contract between the state and the national government relating to such grants. See State ex rel. Johnson v. Central Nebraska Public Power & Irr. Dist., 143 Neb. 153, 8 N.W.2d 841.
The public school lands were received and are held in trust by the State of Nebraska solely for the benefit of the common schools of the State of Nebraska. The state as trustee of the lands and of the income therefrom is required to administer that trust estate under the rules of law applicable to trustees. The title of the lands is not vested in the state with all the ordinary incidents of other titles but the title thereto was granted to and vested in the state upon an express trust for the "support of common schools," with no right or power of the state to use, dispose of, or alienate the lands or any part thereof, except as allowed by the Enabling Act and the Constitution. Anyone dealing with the school lands must do so with knowledge of and subject to the trust obligation of the state. See Propst v. Board of Educational Lands & Funds, 156 Neb. 226, 55 N.W.2d 653, 346 U.S. 823, 74 S.Ct. 39, 98 L.Ed. 348.
*160 Any statute providing for the sale of school lands that does not permit the trustees to get the highest possible price is violative of the best interest of the trust and constitutionally a violation of the duties of the trustee. The statute in question forces the sale of school lands if someone bids the price at which they have previously been appraised, regardless of the fact that it could be evident that a higher price might be secured if the sale was not confirmed.
It has been suggested that the rejection and confirmation of bids can be inferred. To answer that question we need merely to refer to the legislative debate and action on the statute in question. Senators Budd and Harsh, in support of amendments to the act, argued that the Board of Educational Lands and Funds should have the right to reject bids. Senators Adamson, Paxton, Whitney, and Wylie vigorously opposed this position. Their effort prevailed, indicating a legislative intent that the Board be denied any right to reject or confirm bids.
It is fundamental that the intention of the Legislature may be expressed by omission as well as by inclusion. Ledwith v. Bankers Life Ins. Co., 156 Neb. 107, 54 N. W.2d 409; Johnson Fruit Co. v. Story, 171 Neb. 310, 106 N.W.2d 182; Bass v. County of Saline, 171 Neb. 538, 106 N.W.2d 860.
"It is not the province of the court to read into a statute something omitted from it by the Legislature or to discover a meaning not warranted by the legislative language. The omission of a word from an amendment of a statute must be assumed to have been intentional and for a purpose. Courts in giving effect to the amendment may not supply the omission." Ledwith v. Bankers Life Ins. Co., 156 Neb. 107, 54 N. W.2d 409. "To supply these defects, and others which appear in the act, requires legislation, and not judicial construction." State ex rel. Mickey v. Reneau, 75 Neb. 1, 104 N.W. 1151, 106 N.W. 451.
"I need scarcely say to the able laywers that I am now addressing that no such power exists in the courts in cases of casus omissus. If it is true that this contingency absolutely escaped the attention of the law-maker, then it is a case unprovided for, it is a casus omissus, which cannot be supplied by judicial construction. I believe that is the doctrine of the law-books. So that, even looking at this case in the light that, if we construed the law in a certain way, there would be a failure of the administration of the law, and hence considering every doubtful provision so as to make the law consistent with itself in all its parts, if that were necessary in this case, it would be impossible for any court to supply a casus omissus by giving force and effect to the language of the statutes when applied to a subject about which nothing whatever is said, and which, to all appearances, was not in the minds of the legislature at the time of the enactment of the law." In re Contest Proceedings, 31 Neb. 262, 47 N.W. 923, 10 L.R.A. 803.
Any attempt to hold that approval of a sale is inferred or intended as justifying constitutionality is nothing less than judicial legislation. It is true that in the case of ambiguous language the court should give a construction consistent with the legislative intent, but where nothing is said at all concerning what is determined to be a defect, there can be no saving by construction because there is nothing to construe. In any event, in this case the legislative record indicates that the legislative intent was otherwise. The failure to provide for a review of the public sale price is constitutionally bad. Upset bids, fraudulent bids, the chilling of bids, etc., are all left by this act without remedy by the trustee.
This court is committed to the view that the equity jurisdiction conferred by the terms of the Constitution is beyond the power of the Legislature to limit or control. Lacey v. Zeigler, 98 Neb. 380, 152 N.W. 792. In John A. Creighton Home v. Waltman, 140 Neb. 3, 299 N.W. 261, we held *161 that jurisdiction over the administration of trusts and supervisory jurisdiction over charitable trusts are inherent in equity courts of this state and in this court.
The constitutional directive of control over the Board by the phrase "under the direction of the Legislature" was not intended to and is not of sufficient breadth to allow the Legislature to take over the prerogatives of the Board. To hold otherwise would make the constitutional provisions for the Board meaningless.
Paraphrasing what we said in State ex rel. Crounse v. Bartley, 40 Neb. 298, 58 N.W. 966, the power to sell, lease, and manage the educational lands of the state is conferred upon a distinct Board. The Constitution has placed the duty of investing the permanent school funds of the state in this Board. The authority thus conferred, the Legislature is powerless to take it away. The Legislature may by statute provide the manner in which the educational lands shall be leased or sold, yet it cannot empower anyone but the Board to sell or lease such lands. The Legislature may prescribe the mode or manner in which permanent school funds shall be invested, but it has no power to relieve the Board of the duty of making such investments, nor can it authorize any other person or board to invest said funds.
It cannot be denied that the Board in the exercise of its sound discretion may sell some or all of the school lands when in the best interests of the trust it should be done, nor can it be denied that the Legislature may direct the Board to sell school lands within proper bounds for a fiduciary. The problem arises because the acts being questioned mandatorily direct that all of the lands must be sold regardless of the wisdom of the action at the particular moment. Further, section 72-258, R.S.Supp., 1967, provides: "Such lands shall be sold * * * by a representative of the Board of Educational Lands and Funds or by the county treasurer of the county in which the land is located, * * *." (Italics supplied.) This is an assumption of direct control over the school lands on the part of the Legislature, because the legislation mandatorily decrees that the land be sold, and dictates how the sales must be conducted and who may conduct them. What discretion is left the Board in the exercise of its constitutional duty to act only in the best interests of the trust?
In State ex rel. Johnson v. Central Nebraska Public Power & Irr. Dist., 143 Neb. 153, 8 N.W.2d 841, we held: "Any act of the legislature by which the legislature seeks to assume direct control over the public school lands and remove the control of the board of educational lands and funds is unconstitutional, null and void."
We reiterate, the act requires that all school land shall be sold at the expiration of present leases. The Legislature is not directing but rather dictating that regardless of conditions the land be sold. What discretion has it left the Board? How, under this mandate, can the Board carry out its fiduciary responsibility for the trust estate? The law is well established that trustees acting in a fiduciary capacity must at all times exercise such care and diligence in the management and control of a trust estate as would be exercised by a man of ordinary skill and prudence in the management of his own affairs. The designation of public school lands as a trust in the Constitution has the effect of incorporating into the constitutional provisions the rules of law regulating the administration of trusts and the conduct and duties of trustees. A breach of trust in such a situation is in effect a violation of the constitutional provision and has the effect of invalidating the legislation authorizing the breach.
In State ex rel. Ebke v. Board of Educational Lands & Funds, 159 Neb. 79, 65 N. W.2d 392, this court said: "The school lands were received and are held in trust by the State of Nebraska for educational purposes. The state as trustee of the lands and of the income therefrom is required to *162 administer the trust estate under the rules of law applicable to trustees acting in a fiduciary capacity.'" See, also, Banks v. State, 181 Neb. 106, 147 N.W.2d 132.
The rule as to the duty of a trustee is stated in First Trust Co. of Lincoln v. Exchange Bank, 126 Neb. 856, 254 N.W. 569, as follows: "As a general rule, the measure of care and diligence required of a trustee is such as would be pursued by a man of ordinary prudence and skill in the management of his own estate. 26 R.C.L. 1280, sec. 130. He must act honestly and faithfully, in what he believes to be the best interests of the cestui que trust. He must exercise sound discretion. He is bound to proceed with diligence in investigating the nature of the proposed investment, and to use such care in deciding as, in general, prudent men of intelligence and integrity in such matters would employ in their own affairs when making a permanent investment in which the primary object is the preservation of the fund, and the secondary one that of obtaining an income therefrom."
The trial court stated in its journal entry: "The record casts serious doubt on the wisdom of the Legislature in directing the sale of all school lands but, upon a showing that a fair market value will accrue from said sale, the court is without power to interfere and the `prudent man rule' is satisfied." Obviously here we cannot equate market value with the "prudent man rule." If the trial court was correct, and if the trustees obtained the best price obtainable at a particular moment, although to sell at that moment was foolhardy, the "prudent man rule" would be satisfied. This is not the law. It is the duty of a trustee to exercise due care, diligence, and skill in the sale of trust property so as to secure the most advantageous return possible. A trustee is guilty of a breach of trust in selling trust property under disadvantageous circumstances which it is in his power to avoid. 54 Am.Jur., Trusts, s. 436, p. 346.
There is no requirement in the statute for sales at fair market value except by inference. Nowhere is the Board given the right to reject an appraisal, to ask for a reappraisal, or to confirm or refuse to confirm a sale, and as pointed out heretofore, the intent of the Legislature was to deny the Board this right. All that the statute requires is that some representative appraise the property "as privately-owned land" and that the appraised value, whatever it may be, shall be the starting price. To sustain the questioned acts we are required to disregard basic principles of trust law. This we cannot do. The law is void and unconstitutional.
For the reasons given, we find the questioned statutes to be void and unconstitutional. We would reverse the judgment herein.
BOSLAUGH, SMITH, and McCOWN, JJ.
Public auction of state lands imports "* * * a sale * * * with absolute freedom for competitive bidding. Any agreement, * * *, to stifle competition or chill the bidding is a fraud upon the principle upon which the sale is founded." State ex rel. Danaher v. Miller, 52 Mont. 562, 160 P. 513. The statutory requirements of appraisal and public auction assure that the trust will receive value for lands sold prior to 1975. Cf. Lassen v. Arizona ex rel. Arizona Highway Dept., 385 U.S. 458, 87 S.Ct. 584, 17 L.Ed.2d 515. Possibility of a glutted market in 1975 is too remote for consideration now.
School lands, income, and assets are held in trust and the administration of the trust estate is governed by the rules of law applicable to trustees acting in a fiduciary capacity. Anyone dealing with the school lands must do so with knowledge of, and subject to, the trust obligation of the state. Propst v. Board of Educational Lands & Funds, 156 Neb. 226, 55 N.W.2d 653, 346 U.S. 823, 74 S.Ct. 39, 98 L.Ed. 348. The courts have jurisdiction to determine *163 whether those rules of law have been complied with, and the power to set aside or confirm a sale. If the trustee, or persons dealing with the trust assets, desire a judicial determination as to the validity of any such sale, the courts are available. The fact that the sale statute is silent as to the procedures for such a determination does not alter the law of trusts, nor relieve the trustee of its trust obligations, nor make the statute unconstitutional. The statutes, apart from the reference to county treasurers, are not vulnerable to plaintiff's attack.
NEWTON, J.
The controlling opinion of BOSLAUGH, SMITH, and McCOWN, JJ., concedes the correctness of the fundamental principle enunciated in the opinion of SPENCER, J. The Legislature cannot constitutionally bring about a sale of trust assets without recognition of the requirement that the trustee obtain the most advantageous possible sale of such assets. They seek to avoid application of this proposition by reading into the statute the inherent powers of the court in such cases, yet they fail to cite a single precedent sustaining this position. This is in direct contradiction of the most basic of all rules of statutory construction.
The legislative intention, as evidenced by plain and unambiguous language, controls and a determination regarding constitutionality must be made on this basis alone. See Bachus v. Swanson, 179 Neb. 1, 136 N.W.2d 189. The Constitution is the primary law of this state. If we are to hold, as does the controlling opinion, that any statute in derogation of a constitutional provision, when construed, shall have read into it any provision necessary to make it conform to constitutional requirements, or have read out of it provisions conflicting with the Constitution, we would effectively whitewash all legislative acts. We would then be assuming the position of a super Legislature with power to amend all such acts by judicial construction.
It is pointed out in the opinion of SPENCER, J., that the Legislature, in the present case, specifically rejected language which would have permitted the trustee to conform to constitutional requirements. How then can we, in interpreting this act, say that nevertheless the Legislature intended to do that which it refused to do? We would then be supplying by implication the very thing which the Legislature pointedly rejected. Neither reason nor law can sustain such a position.