STATE OF NEBRASKA EX REL. LOREN B. BELKER, APPELLANT, v. BOARD OF EDUCATIONAL LANDS AND FUNDS OF THE STATE OF NEBRASKA ET AL., APPELLEES.

175 N. W. 2d 63

Filed March 10, 1970.    No. 37004.

Ginsburg, Rosenberg, Ginsburg & Krivosha and Rodney P. Cathcart, for appellant.

Clarence A. H. Meyer, Attorney General, and Bernard L. Packett, for appellees.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

On reargument, previous opinion adhered to.

BOSLAUGH, McCOWN, and SMITH, JJ.

The central issue in this case, and the only real issue, is whether the Legislature is authorized to direct the sale of all school lands. It is our opinion that the constitutional provision which vests the general management of all school lands and funds in the Board of Educational Lands and Funds "under the direction of the Legislature" authorizes the Legislature to direct the sale of school lands. Art. VII, § 1, Constitution of Nebraska.

The legislative history of the act does not appear in the record in this case. Whatever it may have been, there is nothing in the act, nor in any legislative history

alluded to, which in any way limits or attempts to limit the jurisdiction or power of the courts to determine, in a proper proceeding, whether the sale of any school lands was conducted in the manner required by law.

Whether the sale of the lands should prove to be a wise decision or not, it is a decision which the people empowered the Legislature to make. This court has no authority to exercise a power which the people have constitutionally vested in the Legislature.

We adhere to the opinion originally filed in this case.

CARTER, J., dissenting.

This matter arises after a reargument of the issues raised by the appeal. The three members of the court upholding the constitutionality of the act under Article V, section 2, Constitution of Nebraska, have concluded to adhere to the former opinion. I disagree with this disposition of the case.

Due to a temporary disability, I was not able to participate in the disposition of the case originally and Colwell, District Judge, sat in my stead. Having participated in the motion for a rehearing and the reargument of the case, I deem it necessary to state my views regarding the constitutionality of the legislation authorizing the sale of the school lands held in trust for the benefit of the common schools of the state.

The statutes primarily questioned here provide in part: "All lands, now owned or hereafter acquired by the state for educational purposes, shall be sold at the expiration of the present leases. * * * Prior to such sale, the land shall be appraised for sale purposes in the same manner as privately-owned land by a representative appointed by the Board of Educational Lands and Funds, and thereafter shall be sold at public sale at not less than the appraised value; Provided, * * *." § 72-257, R. S. Supp., 1967. "Such land shall be sold, at public auction, by a representative of the Board of Educational Lands and Funds or by the county treasurer of the county in which the land is located, to the highest

bidder. The appraised value for sales purposes as provided in section 72-257 shall be the starting bid price. * * * Settlement shall be made by paying cash of not less than twenty percent of the purchase price at the time of sale and the balance shall be payable in cash within ninety days of the date of sale. If the person submitting the high bid for the land fails to pay the balance of the purchase price and complete the sale within ninety days his rights under the sale, including the twenty per cent down payment, shall be forfeited by the board and a new sale shall be authorized." § 72-258, R. S. Supp., 1967. It is clear to me that if the foregoing provisions are complied with, the sale is to be final and complete and the purchaser entitled to a deed.

The original concurring opinion of Boslaugh, Smith, and McCown, JJ., State ex rel. Belker v. Board of Educational Lands & Funds, 184 Neb. 621, 171 N. W. 2d 156, in sustaining the constitutionality of the foregoing provisions of the law holds that irrespective of the shortcomings of the statutes, the trustee, or persons dealing with the trust assets, have the courts available to them to determine whether or not the rules governing trusts have been properly applied and that such fact is sufficient to sustain a holding of constitutionality. This opinion states: "The fact that the sale statute is silent as to the procedures for such a determination does not alter the law of trusts, nor relieve the trustee of its trust obligations, nor make the statute unconstitutional." Under this theory, the Legislature can merely direct a sale and the courts will supply the missing language, compel compliance with such directions of the court, and hold the act constitutional. This has been tried many times in this state with fatal results in each and every instance. Cases in this court consistently and unanimously support such results. They are cited in the dissenting opinion by Spencer, J., in State ex rel. Belker v. Board of Educational Lands & Funds, 184 Neb. 621, 171 N. W. 2d 156, and will not be repeated

here. In 82 C. J. S., Statutes, § 328, p. 635, it is said in part: "It has been held to make no difference that the omission resulted from inadvertence, or because the case in question was not foreseen or contemplated, or that as a result of the omission the statute is a nullity."

The controlling opinon in this case concedes that the school lands of this state are held in trust for the benefit of the common schools. The relationship of trustee and beneficiary is a fiduciary one imposing the utmost good faith in the handling of the trust property. Among the duties of a trustee is to require in the case of the sale of trust property that he shall obtain the highest price possible and refuse to make a sale if the sale was fraudulent, or the result of chilled bidding, or any other conduct or circumstance that resulted in an inadequate sale price. The statute under consideration provides for an appraisal and a public sale, after which, if the bid price equals or exceeds the appraisal price, the sale is completed upon payment of the bid price within 90 days. The statute therefore deprives the trustee, the Board of Educational Lands and Funds, from exercising the powers and duties of a trustee imposed by the creation of the trust relationship by the Constitution.

It is asserted in the controlling opinion that the failure to provide for the sale of school lands consistent with its trust status may be read into the statute by implication and enforced as if written into the statute. This is simply not true. See 82 C. J. S., Statutes, § 328, p. 635. An implication to be drawn from the absence of language in a statute is a mere guess and the guess, if made, is judicial legislation. But assuming, solely for the purpose of argument, that there is language in the statute from which an intent can be implied, the position of the controlling members of the court remains wholly untenable under the facts in this case.

The history of the act shows conclusively that the Legislature intended that the appraisal, sale, and payment were to constitute the sole basis for the passing of

ownership. The right of the trustee to perform its duty was intended to be cut off. Its duty to protect, conserve, and safeguard the assets of the trust for the benefit of all its beneficiaries and its liability for loss thereof resulting from its failure to exercise reasonable care, prudence, and diligence were cast aside in favor of a summary binding sale for the very purpose of subverting the duty of the trustee and the rights of beneficiaries.

The history of the statutes under consideration is set forth in the dissent of Spencer, J., in State ex rel. Belker v. Board of Educational Lands & Funds, *supra*, and will be only briefly set forth here. The statutes here involved were before the Legislature in their present form. An amendment was offered that would give the Board of Educational Lands and Funds the right to reject bids. The amendment was rejected, plainly indicating that the Legislature did not intend that such board as trustee could see to it that the land did sell for its highest market price. This legislative action demonstrated that the Legislature intended to obstruct the trustee in the performance of its duty and to provide for a completed sale if the bid equalled or exceeded the appraised value whether or not the best interests of the beneficiaries were served. That this was the intent of the Legislature is further shown by the provision that the county treasurer of the county in which the land was located could sell school lands, a person not even a trustee. With this situation existing, a court cannot possibly justify finding or creating a legislative intent contrary thereto by implication or otherwise.

In Love v. Wilcox, 119 Tex. 256, 28 S. W. 2d 515, 70 A. L. R. 1484, it is said: "No court could justify putting into a statute by implication what both houses of the Legislature had expressly rejected by decisive votes. The House and Senate Journals leave no room for doubt of the legislative intent to deny the power exercised by the State Committee in seeking to debar names from the primary ballots under the resolutions of February 1,

1930. Once the legislative intent is ascertained the duty of the court is plain. To refuse to enforce statutes in accordance with the true intent of the Legislature is an inexcusable breach of judicial duty, because an unwarranted interference with the exercise of lawful, legislative authority." See, also, Blome Co. v. Ames, 365 Ill. 456, 6 N. E. 2d 841, 111 A. L. R. 940; 50 Am. Jur., Statutes, § 330, p. 322.

In Long v. Poulos, 234 Ala. 149, 174 So. 230, the court said: "If the intention of the Legislature can be ascertained from the language used and the history of the enactment, it is not necessary to apply any presumptions of law which will aid in the interpretation when its meaning does not otherwise appear. * * * We do not think it is necessary to draw upon such presumptions in this case because we think that without them we are able to ascertain the legislative intent."

In State, Department of Highways v. Busch (La. App.), 220 So. 2d 513, it was said: "We cannot supply by interpretation what our lawmakers have failed or refused to do by legislation."

"If legislative intent has meaning for the interpretative process it means not a collection of subjective wishes, hopes, and prejudices of individuals, but rather the objective footprints left on the trail of legislative enactment. Legislative intent can't be 'dreamed-up.' It can be *speculated about*; but it can be *discovered* only by factual inquiry into the history of the enactment of the statute, the background circumstances which brought the problem before the legislature, the legislative committee reports, the statements of the committee chairman, and the course of enactment. To pursue this course means work and hard work, but if it is pursued it is seldom that the pursuit is fruitless. An honestly conducted inquiry into these considerations will fail but infrequently to disclose to the inquirer the purpose and intent of the legislature and will clarify the applicability of the statute to the question in litigation." 2 Suther-

land, Statutory Construction (3d Ed.), § 4506, p. 321.

"Be this as it may, judicial interpretation should never be judicial legislation. We may not, therefore, under the guise of interpretation, read into a statute matters which have been omitted by the legislature particularly where it appears that the omission might have been intentional." In re Estate of Barnett, 97 Cal. App. 138, 275 P. 453.

"There are two well established rules by which we must be governed in construing a statute. On the one hand, we must give effect to each and every part of it; on the other, we are not permitted to read into a statute anything which we may conceive the legislature may have unintentionally left out. Rather than violate the latter rule, the court will leave ambiguous phrases of statutes ineffctive and refer their correction to the legislature. And that is what must be done with respect to the phrase we are considering. * * * To render the phrase effective would require much supplementation by the court. * * * To supply these deficiencies in the act in order to give effect to the ambiguous phrase, would amount to judicial legislation. From the phrase itself, we think it would be a violent assumption to say that the legislature intended in any manner to change or modify our long established practice and procedure with respect to the appointment of trustees for insolvent corporations. That such an assumption would be repugnant to the legislative intent, is apparent from the title of the act, * * *." Seattle Assn. of Credit Men v. General Motors Acceptance Corp., 188 Wash. 635, 63 P. 2d 359.

"In the same case it was also held that 'the court cannot, under its powers of construction, supply omissions in a statute, especially where it appears that the matter may have been intentionally omitted.'" Appeal of Infants Welfare League Camp, 169 Pa. Super. 81, 82 A. 2d 296.

"If the omission was intentional, no court can supply it. If the omission was due to inadvertence, an attempt

to supply it by including the omitted case would be tantamount to adding to a statute a meaning not intended by the Legislature." Mitchell v. Mitchell, 312 Mass. 154, 43 N. E. 2d 783.

The foregoing authorities when applied to the facts in this case show the plain intent of the Legislature to circumvent the duties and liabilities of the trustee and the right of the beneficiaries of the trust to have the trust property sold for the highest market price obtainable in accordance with the fiduciary relationship of the parties. The holding of the controlling opinion that the court may supply the missing legislative intent by interpretation or implementation, even though it is directly contrary to the real purpose and intent of the Legislature, is nothing more than judicial legislation and an encroachment upon the powers of the Legislature forbidden by the separation of powers provision of our state Constitution. The very idea that this court may rewrite a statute and give it effect, even though in conflict with the ascertained and real intent of the Legislature, is abhorrent to every student of constitutional government.

"In Armstrong v. Board of Supervisors, 153 Neb. 858, 46 N. W. 2d 602, it is said: 'If the language of a statute is clear and unambiguous, courts will not by interpretation or construction usurp the function of the lawmaking body and give it a meaning not intended or expressed by the Legislature.' See, also, Federal Farm Mortgage Corp. v. Adams, 142 Neb. 202, 5 N. W. 2d 384; 50 Am. Jur., Statutes, § 225, p. 204. A statute is not to be considered as appropriate for construction as a matter of course. It is only ambiguous statutes of uncertain meaning to which the rules of construction have application. In Cross v. Theobald, 135 Neb. 199, 280 N. W. 841, this court said: 'Where the language of a statute is plain and unambiguous and its meaning clear and unmistakable, there is no room for construction, and the courts are not permitted to search for its meaning beyond the

statute itself.' " Ledwith v. Bankers Life Ins. Co., 156 Neb. 107, 54 N. W. 2d 409.

"We are not warranted in supplying words which appear to have been designedly omitted, or in accomplishing the same result indirectly by giving to the words used the broad import and meaning for which the state contends." State v. Pence, 173 Ind. 99, 89 N. E. 488.

"This being true, must we not accept the statute as we find it and concede that the General Assembly in its wisdom omitted the word 'newspapers' from the second sentence for some reason which appeared to that august body to be sufficient? Whatever may have influenced the General Assembly to omit the word 'newspapers' from the second sentence in the statute, if it did purposely do so, is sufficient, and courts are not authorized to interpolate words into a statute which the lawmaking body has purposely omitted. * * * The learned trial judge delivered a written opinion from which we take the following pertinent observation: 'The argument of the Commonwealth is that the word "newspapers" was inadvertently omitted by the legislature in the second sentence adverted to, and having been inadvertently omitted by the legislature, it should be included by the court. This seems to me clearly to confound the functions of these two agencies of the government. Under the Constitution it is the province of the legislature to enact and the province of the judiciary to interpret, and it is of vital importance to the maintenance of our institutions that the functions of the two departments shall be kept separate and distinct as provided in the Constitution. However beneficent a law might be, it is for the legislature to pronounce it. However much public policy may demand the enactment of a law, the court cannot enact it.' " Commonwealth v. Lipginski, 212 Ky. 366, 279 S. W. 339.

"In the construction of statutes, words should never be supplied except to effectuate a meaning clearly shown by the other parts of the statute and to undertake to

augment the substance of a statute as here desired would be an abortive act of legislation rather than a proper exercise of the power of judicial construction." Saslow v. Previti, 17 N. J. Misc. 29, 3 A. 2d 811.

The controlling opinion, however, purports to sweep these fundamental concepts under the rug by stating that they have no application because equity courts are open to enforce the duties, liabilities, and fiduciary relationship of the parties. Let us examine the validity of this holding, a holding supported by no legal authority, court decision, or authoritative text, in the controlling decision of this case.

I am in full agreement with the controlling opinion that our equity courts have general supervisory powers over the administration of trusts. According to available records, the value of unsold school lands was at least $70,100,000. The number of tracts to be sold is not known to me but there are at least 544 since there are that many tracts under lease. Under the theory of the controlling opinion, it is possible that a minimum of 544 suits would be required to insure that the trustee procured the highest possible market value of the land for the benefit of the beneficiaries of the trust. It is not at all likely that the Board of Educational Lands and Funds would bring such suits, a board whose duties are prescribed by the Legislature and whose salaries are fixed by it. If a beneficiary brought suit to determine the adequacy of the sale price, the cost of attorneys' fees and court expense would probably far exceed the benefit accruing to a single beneficiary even if the litigation proved successful. But more important still, the statute deprives the trustee of its duty to act in the capacity of a fiduciary and the duties and responsibilities of the trustee acting in its fiduciary capacity. It deprives the beneficiaries of the benefit of the trustee in seeing to it that the highest market price is obtained for the common schools of the state. It would subject the state to the payment of losses from sales not made in

accordance with the law governing the sale of trust property as provided in Article VII, section 9, of the Constitution. I submit that the theory announced in the controlling opinion is not only not in accordance with law but, for all practical purposes, provides no adequate remedy for a breach of the fiduciary relationship. I submit that the power of the courts to control the administration of trust property can best be exercised by insisting that the statute providing for the sale of school lands be consistent with the sale of trust property and the duties, liabilities, and benefits accruing to trustees and beneficiaries growing out of the fiduciary relationship of trustee and beneficiary created by the Constitution. I submit that the theory of the court's opinion is unworkable, defeats the purposes of the law of trusts, and in practice provides no effective protection to the beneficiaries of the trust. I submit that the general power of equity courts to supervise trusts through collateral attack does not afford an adequate remedy, nor does it comply with the necessary attributes of due process. In addition thereto, a multiplicity of suits would be required to insure compliance with the law of trusts and the protection of the beneficiaries of the trust.

This case has been twice argued. In each argument four judges were of the opinion that the statutes were unconstitutional. In the first argument, Colwell, District Judge, sat as a member of the court. In the second, I resumed my place on the court and Colwell, District Judge, did not participate. The result is that five judges sat on the two arguments who firmly believe that the act before us is unconstitutional. On the other hand, the same three members of the court have stood in the shadow of Article V, section 2, of the Constitution, and insisted that the act is constitutional. I do not intend to infer any irregularily in constituting the court in either instance. There was none. My only comment is that three members of the court under the provisions of

Article V, section 2, of the Constitution, are authorized to sustain the constitutionality of a legislative act without citing a single case or text authority. On the other hand, the five dissenting members of the court have cited ample authority to sustain their position that the act is unconstitutional. I submit in all fairness that if the position of the three members of the court can sustain their holding of constitutionality, and I am confident they cannot, it is encumbent upon them to do so. In my opinion, the controlling opinion is legally unsound and the failure to cite supporting authority affords some evidence to confirm that opinion.

The purpose of the statute is shown by the language of the act and the history of its enactment. It is clearly demonstrated that the legislative intent is to make the sale therein provided the final completion of the sale to the highest bidder. The object of the controlling opinion is to avoid questions of unconstitutionality by a construction contrary to the intent of the Legislature. This is judicial legislation under all of the authorities and is violative of the division of powers provision of the state Constitution. Such a construction is not only void as judicial legislation, but it has the effect of eliminating the protection afforded the resulting trust fund and its beneficiaries by virtue of its status as trust property. The purported remedy of the controlling opinion is not only inadequate, but it will require a multiplicity of suits to enforce the protections required by the Constitution in designating the school lands of the state as trust property. I submit that our adopted opinion is contrary to the Constitution and the applicable law, is an arbitrary assumption of legislative powers by rewriting the act contrary to the intent of the Legislature, and has the effect of circumventing the rights of the beneficiaries of the resulting trust fund by a disregard of the manner provided for the sale of trust property. The act is unconstitutional and void, and contrary to the best interests of the state, the beneficiaries of

the trust fund, and the good conscience of a court of equity.

Simple justice and the applicable law require that its beneficiaries should be protected with the utmost fidelity without the necessity of engaging in costly collateral litigation. I submit that the controversial statute is wholly void and arbitrary and that the only legal and adequate remedy is a declaration of unconstitutionality by this court. Having these views, I emphatically dissent from the unsupported holdings announced in the opinion of the controlling members. I would reverse the judgment of the district court and enter a declaration of unconstitutionality.

WHITE, C. J., and SPENCER and NEWTON, JJ., join in this dissent.

Separate Opinion by SMITH, J.

From original submission of this case on January 14, 1969, almost 14 months have elapsed. The interval, highly abnormal for this court, is an example of predilection for delay that we ought to prevent.

SPENCER, J., dissenting.

I reaffirm my dissent to the three-judge opinion upholding the constitutionality of sections 72-257 and 72-258, R. S. Supp., 1967, and 72-258.01, R. R. S. 1943 (as amended by Laws 1965, c. 435, §§ 2, 3, and 4, pp. 1386 and 1387, and Laws 1967, c. 466, §§ 10 and 11, p. 1450), found at 184 Neb. 621, 171 N. W. 2d 156. I am authorized to state that White, C. J. and Carter and Newton, JJ., adhere to that previously declared position.

The controlling opinion in this case states that the only real issue is whether the Legislature is authorized to direct the sale of all school lands. This is not the issue at all. No contention is advanced by anyone that the power to sell school lands is not lodged in the Legislature. The issue is whether the statute implementing the constitutional authorization to sell meets the requirements for the sale of trust property where, as here, the Constitution declares it to be such. The dissenting

opinion of Judge Carter points out not only that the statute does not comply, but that it was the intention of the Legislature not to comply.

Additionally, I attack the right of three members of this court to override a majority opinion, and state that the following sentence from Article V, section 2, Constitution of Nebraska, "No legislative act shall be held unconstitutional except by the concurrence of five judges," is itself unconstitutional.

The Enabling Act of Congress, permitting the people of Nebraska to adopt a Constitution and form a state government, required a republican form of government not repugnant to the Constitution of the United States and the principles of the Declaration of Independence. As the Supreme Court of Colorado said in People v. Western Union Telegraph Co., 70 Colo. 90, 198 P. 146, 15 A. L. R. 326: "The original Constitution of Colorado was a solemn compact between the State and the Federal government, a compact which stipulated that it should never be altered save in the manner therein provided, and that all amendments and all revisions thereof would conform to the supreme law. The whole people of the state have no power to alter it save according to their contract. They cannot do so, even by unanimous consent, if such alteration violates the Constitution of the United States. Should they make the attempt their courts are bound by the mandate of the Federal Constitution, and by the oath they have taken in conformity therewith and with their own Constitution, to declare such attempt futile, to disregard such violation of the supreme compact, and decline to enforce it. There is no sovereignty in a state to set at naught the Constitution of the Union, and no power in its people to command their courts to do so. That issue was finally settled at Appomattox."

This provision does not limit the authority of this court to declare an act unconstitutional if it is in violation of the state Constitution only, but prohibits such

declaration without five votes, whether it is unconstitutional under the state or the federal Constitution. This is violative of the federal Constitution. Any dilution of the judicial power shatters the fundamental principle that government is divided into three coordinate branches —legislative, executive, and judicial. Any limitation upon what is rightfully a part of the judicial power destroys the republican form of government. If it is possible to require more than a majority vote, is it not also possible to require a unanimous vote? To so hold is foreign and hostile to our republican form of government.

There are certain acts which even the state Constitution cannot abrogate. One of these is to limit the authority of this court to exercise its sovereign and inherent power as the judicial branch of government, free from the dictates of the Legislature.

This constitutional provision as applied in the instant case permits the Legislature to dilute the inherent power of this court, as well as depriving the beneficiaries of the public school lands' trust of property without due process of law. In other jurisdictions a simple majority may hold a legislative act unconstitutional. Because of this provision, Nebraska requires five of seven judges to so hold. Citizens of Nebraska are not therefore entitled to all of the privileges of citizens in the several states.

The Supreme Court of the United States in Reitman v. Mulkey, 387 U. S. 369, 87 S. Ct. 1627, 18 L. Ed. 2d 830, struck down an act of the State of California which sought to prohibit open housing laws unless first approved by a majority vote of the people of California. The court held that even a majority could not promulgate legislation inherently contrary to rights afforded an individual under the Constitution of the United States. I maintain that our constitutional provision permitting a minority of the citizens of Nebraska, as represented by three judges upon this court, to thwart the will of

the majority is in violation of the equal protection clause of the Constitution of the United States.

WHITE, C. J., dissenting.

As early as 1894 and as recently as 1962 this court has stated and reaffirmed the principle that the constitutional authority and power to sell, lease, and manage the educational lands of the state is conferred upon a distinct board and that the authority thus conferred, the Legislature is powerless to take away. At the present time the Board of Educational Lands and Funds has sole power under the Constitution to manage and control school lands. State ex rel. Crounse v. Bartley, 40 Neb. 298, 58 N. W. 966; State v. Kidder, 173 Neb. 130, 112 N. W. 2d 759.

This constitutional function conferred upon the board "under the direction of the legislature" has been present since 1875. Nebraska Constitution of 1875, Article VIII, section 1; Nebraska Constitution of 1920, Article VII, section 1. In light of the above language it is clear that the responsibility, duty, and discretion to sell, lease, and manage the school lands is in the board and not the Legislature. Thus the word "direction" in the phrase "under the direction of the Legislature," cannot be construed to mean command. Rather, the word "direction" must be defined as meaning care and superintendence; a guidance or supervision of action, conduct, or operation. Town of Palatine v. Canajoharie Water Supply Co., 90 App. Div. 548, 86 N. Y. S. 412; Webster's Third New International Dictionary, p. 640 (1968). The prevailing minority states that "under the direction of the Legislature" authorizes the Legislature to direct the sale of school lands and also that whether the sale of the lands should prove to be a wise decision or not, it is a decision which the people have constitutionally vested in the Legislature.

One instance is sufficient to emphasize the fallacy in this reasoning. As pointed out by Carter, J., in the present case, and Spencer, J., in his previous opinion, the

statute does not provide for, and the legislative intent was to prohibit, giving the board any right to reject or confirm bids. State ex rel. Belker v. Board of Educational Lands & Funds, 184 Neb. 621, 171 N. W. 2d 156. It cannot be denied that the right to confirm or reject bids at a sale of land is the very essence of discretion. Thus, without any consideration of applicable trust law, it is clear under our previous decisions that the Legislature has usurped the constitutional duty of the board. Such usurpation is itself unconstitutional. The prevailing minority blithely permits this by stating that it is the will of the people with total disregard, or possibly disdain, for the previous interpretations this court has placed upon the stated will of the people. The direction to sell, while reserving no discretion in the board to confirm or reject bids, is more than a guidance or supervision of action, conduct, or operation. It is the arbitrary assumption of duties constitutionally placed upon the board by the will of the people and thus must fail as being unconstitutional.

This reasoning is also supported by the fact that Article VII, section 8, of the Constitution, pursuant to a 1920 amendment, states that school lands shall not be sold except at public auction under such conditions as the Legislature shall provide. This power to set the conditions of sale is a function of guidance or supervision and cannot be looked at as giving the Legislature the power to command sale of the school lands. The language used here clearly infers that the Legislature is not vested with the power to command sale of the school lands.

The prevailing minority states that there has been no present abuse of the trustee's discretion and that if an abuse is present when the land is sold an action on behalf of the beneficiaries may then be brought. As pointed out by Carter, J., this is in effect, no remedy at all as individual benefits would be grossly dispropor-

tionate to the costs of such an action by a trust beneficiary.

Aside from the ability of the Legislature to make such a command, the command itself is clearly a blatant violation of the trustee's discretion. The Legislative command in 1965 to sell all of the school lands as the leases expire, with over half of the land going on the market in 1975, shows total disregard for what future market conditions in a volatile economy may be. The lands are required to be sold without regard to the possibility of a depressed economy, a glutted market, or the availability and cost of money to purchase the land. Such a policy is clearly not prudent and is an abuse of the trustee's discretion. As such, it should be stopped in its gestation rather than aborted on a piecemeal basis as the expiration of each lease gives birth to a sale. As pointed out by Carter, J., the latter alternative is a totally inadequate remedy. I submit that the 1965 command is a present violation of the trustee's discretion as it governs sale of all the land, not just the sale of an isolated tract which may or may not be wise at the time sold.

An additional consideration is the fact that the available investments for proceeds of the sales are limited. In considering the wiseness of a sale it cannot be isolated from what will become of the proceeds. Land has been on a general rise in value for some time, the same is not true of legally permitted investments. The investments permitted by statute, section 72-202, R. R. S. 1943, are generally of the type considered as income investments rather than capital appreciation investments. To some extent the opposite is true of land. The possibility of increased income for the use of common schools is attractive, but it should not be used to close our eyes to the fact that in this age of inflation most investment analysts would advise a balanced portfolio which would also provide for capital appreciation. This might well be impossible if all of the school lands were sold and the

proceeds invested pursuant to section 72-202, R. R. S. 1943. A trustee is required to dispose of trust property upon the most advantageous terms which it is possible for him to secure for the benefit of the cestui que trust whom he represents. State ex rel. Ebke v. Board of Educational Land & Funds, 154 Neb. 244, 47 N. W. 2d 520. To be prudent embraces foresight to the extent that reinvestment of the proceeds is predetermined, as it is under section 72-202, R. R. S. 1943. This, among other things, is indicative of the trustee's violation of discretion and the consequent invalidity of the act.

Article IV, section 3, of the Constitution of 1866, gave exclusive chancery and common law jurisdiction to the district courts and Supreme Court. This theme has continually been carried forward and is presently stated in Article V, section 9. The Legislature is powerless to take away the equity jurisdiction conferred by the Constitution. Lacey v. Zeigler, 98 Neb. 380, 152 N. W. 792. Jurisdiction over the administration of trusts and supervisory jurisdiction over charitable trusts are inherent in equity courts of this state and in this court, and the Legislature has no power to limit or control this jurisdiction. John A. Creighton Home v. Waltman, 140 Neb. 3, 299 N. W. 261.

The framers of the original Constitution placed the school lands in trust with the fund to remain inviolate and undiminished. The creation of a trust and provision that the funds remain inviolate clearly shows the intent of the framers that the courts, through their equity jurisdiction, should retain control and supervision over the fund to prevent or remedy any and all violations of the trustee's duty.

The gift of this land under the Enabling Act and the acceptance and constitutional provisions for it are in the nature of a trust deed forming a solemn compact with the federal government. The state, in its generic sense, is the trustee with all branches of government participating in the administration of the trust. The Board

of Educational Lands and Funds, executive branch, has the power to sell, lease, and manage under the direction of the Legislature and subject to the supervisory powers of the equity courts. It cannot be argued but that the creation of this trust under such a system of checks and balances was to guard against any violation of the trustee's discretion. Should the fact that a 1920 constitutional amendment will allow a legislative act to be overturned only by five votes of this court be permitted to disrupt this system of checks and balances? The answer must be an unequivocal no. A review of the history of the 1920 Constitutional Convention reveals not the slightest intent to invade or impede this court's jurisdiction to control and administer, in a proper case, the provisions of this trust and to protect the school children of the State of Nebraska against any type of state action whether by the people directly or by legislative action.

It is the duty of the courts to reconcile and harmonize, if reasonably possible, conflicting statutory or constitutional provisions. State ex rel. Johnson v. Marsh, 149 Neb. 1, 29 N. W. 2d 799; Swanson v. State, 132 Neb. 82, 271 N. W. 264; Elmen v. State Board of Equalization & Assessment, 120 Neb. 141, 231 N. W. 772; 16 C. J. S., Constitutional Law, §§ 16, 23, 25, 26, and 38, pp. 72, 91, 98, 99, and 117. In a literal context the 5-2 provision would seem to apply to any act of the Legislature. However, when we examine the context of the school lands trust, its origin, its formulation in the constitutional provisions, and the duties of this court in enforcing the administration of this trust, it seems to me that "an act of the Legislature" can never mean administrative actions by the Legislature in behalf of the state in the exercise of its power as a trustee of the school lands. To otherwise hold would give the Legislature a power superior to that of the judicial or executive branch and clearly defeat the careful system of checks and balances formulated by the drafters of the Constitution to protect this trust. The compact establishing this trust was

in form a constitutional provision, but in substance a trust deed. If the fundamental nature of the administrative power over the school land trust is to be circumscribed by independent judicial control, it cannot be transcended by such state action taking the form of an exercise of the general law-making power.

Under the original compact and its acceptance by the people of the State of Nebraska, no state action whether in the guise or form of legislative action or constitutional amendment of any nature whatsoever can assume to the Legislature the arbitrary and unreviewable power to manage the corpus of this trust as it sees fit.

The problem here is fundamental and it is also unique in trust law. It is unique because the trustee itself (the State) has embodied and integrated within itself the general law-making power through which the legislative will of the people must be expressed. Can this power be used to transcend its limitations? Is a declaration by the trustee state in the form of a legislative enactment necessarily an exercise of legislative power in any respect? Can the same power that administers the trust determine its extent? Can the original limitations incorporated by solemn compact be extended by the ordinarily overriding sovereignty of the state? Can the trustee pull itself up by its own boot straps?

Research reveals one case parallel, though not exactly in point, with the situation presented here. In Bridgeport Public Library & Reading Room v. Burroughs Home, 85 Conn. 309, 82 A. 582, the court was faced with the problem of a legislative act or resolution for the sale of real property held by a charitable public trust under the direction and control of the state Legislature. The parallelism to our case here was aptly stated by the Supreme Court of Connecticut as follows: "The decision of the Supreme Court of the United States in Stanley v. Colt, 5 Wall. (U. S.) 119, supported by others prior and subsequent, removes from the field of discussion any question as to the existence of a power in the sovereignty

of the State fully adequate to bestow upon trustees administering a public charitable trust authority as to its administration such as the General Assembly attempted to confer in the present instance. Perin v. Carey, 24 How. (U. S.) 465, 501; Ould v. Washington Hospital, 95 U. S. 303, 312; Jones v. Habersham, 107 U. S. 174, 183, 2 Sup. Ct. Rep. 336."

That court disposed of the issue in that case without examining any question as to "constitutionality." In its opinion the court held, in language self-explanatory as to its application here, as follows:  "* * * there has remained no doubt that our Constitution is to be construed as a grant and not as a limitation of power, and that the *exercise of judicial power is forbidden to the legislative branch of the government, as the legislative is to the judicial.*  * * * The legislative power must be found somewhere outside of the judicial domain, and within the legislative, or *it is nonexistent.* * * * It concerns a trust, which is emphatically a matter of conscience, and a charitable trust, which is peculiarly the subject of a court of equity's care and solicitude. Bispham's Principles of Equity (8th Ed.) § 8; Stanley v. Colt, 5 Wall. (U. S.) 119, 169. The power is one which has come into our American jurisprudence in conformity with the English original, and is an adjunct of the judicial power. Its exercise involves an appeal to the conscience of the chancellor through an application duly made, an inquiry, and a determination embodying the exercise of discretion. These are peculiarly judicial functions. The judicial power includes such power as the courts, under the English and American systems of jurisprudence, have always exercised in legal and equitable actions."

That court continued: "We have no occasion to attempt to define the exact limits of either the judicial or the legislative power, *or to draw the dividing line between the two. It is certain, wherever that dividing line may be* or however indefinite it may be at points;

that jurisdiction over this charitable trust, to see that it is properly and beneficially administered, that the purpose of the donor does not fail, and that the interests of the beneficiaries be subserved, under changing conditions and with the lapse of time, belongs to the judicial department of the government, *and is in no respect an incident of the legislative.*

"*The resolution of the General Assembly in question, in so far as its purports to confer authority upon these trustees, must therefore fail of its purpose. The courts, in the exercise of their chancery powers, are alone competent to confer such authority. That authority not having been obtained, any attempt on the part of the trustees to sell the property would be in excess of their powers.*" (Emphasis supplied.)

This court has consistently held that a violation of the trustee's duty is a violation of the Constitution itself. In this case, we are compelled to go one step further and hold that the Constitution itself and any agency purporting to act under its delegated powers may not violate this trust in the guise of a constitutionally exercised power. A majority of this court has determined that the legislative act is a violation of the trustee's fiduciary duty. A majority now holds that the power sought to be exercised is subject to the supervisory control of the courts in their exclusive constitutional jurisdiction over the supervision of charitable trusts. A majority now holds that this supervisory control and jurisdiction may not be limited or changed by the trustee state (even though sovereign) by casting the extension of their powers or the violation of their trust duties in the form or the guise of a "constitutionally" exercised "legislative" power.

In conclusion it has been said that the protections of procedure are of the essence of due process. No better illustration could be made of that principle than in the context of this case. Our original Constitution and all subsequent Constitutions and amendments have created

the procedural power necessary for the district and Supreme Courts to supervise and administer the school lands trust and to guard against invasions of the beneficiary's rights by state action of any nature whatsoever. To hold that these basic powers enumerated and declared in the Constitution may be eroded, no matter in how infinitely small degree, is, in my opinion a violation of our constitutional mandate to protect and guard this sacred trust against invasion by either the Legislature or by the people themselves.

CARTER, SPENCER, and NEWTON, JJ., join in this dissent.