F. Faye Bessey et al., Appellees, v. Board of Educational Lands and Funds, State of Nebraska, Appellant.

178 N. W. 2d 794

Filed July 24, 1970. No. 37445.

Clarence A. H. Meyer, Attorney General, and Bernard L. Packett, for appellant.

Barney & Carter, for appellees.

Heard before White, C. J., Spencer, Boslaugh, Smith, McCown, and Newton, JJ., and Colwell, District Judge.

White, C. J.

In this prophetic sequel to State ex rel. Belker v. Board of Educational Lands & Funds, 184 Neb. 621, 171 N. W. 2d 156, on rehearing, *ante* p. 270, 175 N. W. 2d 63, we are now asked by the State to exercise a supervisory trust jurisdiction over the school lands trust to set aside a successful bid and order a new sale of school

lands sold under the new statute directing their mandatory sale.

The statute, section 72-258, R. S. Supp., 1967, now adamantly and unequivocally held constitutional by the controlling minority opinion of the court, says in pertinent part as follows: "Such land *shall* be sold, at public auction, by a representative of the Board of Educational Lands and Funds or by the county treasurer of the county in which the land is located, *to the highest bidder.*" (Emphasis supplied.) Following this is the lone and only provision authorizing the board to resell the property which is only in case of the highest bidder's failure to pay the balance of the purchase price.

The essential facts of this case presenting the problem are very simple. The land was appraised under the statute (section 72-204, R. S. Supp., 1967) by the board at a value of $35,840. It sold to Bessey and Simmons, the appellees, for $66,560, the highest bid. Upon receipt of a new bid in the sum of $73,225, *over twice the board appraisal,* the board attempted to resell the property and this action of the district court enjoined a new sale. We affirm the judgment of the district court.

The State does not contend that the sale was not conducted "in the manner required by law." The statute was strictly complied with and the minority declaration to that effect was fully complied with. See controlling minority opinion, State ex rel. Belker v. Board of Educational Lands & Funds, on rehearing, *ante* p. 270, 175 N. W. 2d 63, at page 271.

With a strange and paradoxical ambivalence, illustrative of the historic duality and conflict of interest between the beneficiary school children and the political pressures of private ownership, the State now reverses its position in Belker and asks the court to modify the language of the statute and step in and supervise this individual sale. It now contends that the Board of Educational Lands and Funds has the right and power to reject a sale and submit the same to further bidding,

and that this court is either the creator or protector of this power and right.

But judicial restraint and a proper regard for the principle of separation of powers in our government forbids this charitable usurpation, because the very contention of the majority of this court that ultimate supervisory power over the sale of these lands was curtly and almost summarily rejected by the controlling minority in Belker. We will not burden this opinion with a quoting review of the Belker opinions. Could it be clearer that the *majority* contention of statutory invalidity because of legislative emasculation of the board's and this court's constitutional trust powers was rejected out of hand? The declaration is that the statute is constitutional and wholly valid. It means what it says, and says what it means. No one suggests any ambiguity or vagueness in its language. History alone dictates that its design was to remove all interfering impediments to mandatory sale. It says, "* * * *shall* be sold at the expiration of the present leases, * * * at public auction, * * * to the highest bidder." (Emphasis supplied.) A new sale can only be held by the board when the bidder fails to pay. §§ 72-257 and 72-258, R. S. Supp., 1967.

The now asserted contention that we can hybridize the statute and write in some saving clause has already been passed upon and disposed of by a majority of this court. As later discussed in this opinion, the now revealed offer of an amendment to accomplish such an objective was defeated. In State ex rel. Belker v. Board of Educational Lands & Funds, on rehearing, *ante* p. 270, 175 N. W. 2d 63, at page 273, the majority of this court said: "The history of the act shows conclusively that the Legislature intended that the appraisal, sale, and payment were to constitute the sole basis for the passing of ownership. The right of the trustee to perform its duty was intended to be cut off. Its duty to protect, conserve, and safeguard the assets of the trust for the benefit of all its beneficiaries and its liability for loss

thereof resulting from its failure to exercise reasonable care, prudence, and diligence were cast aside in favor of a summary binding sale for the very purpose of subverting the duty of the trustee and the rights of beneficiaries."

Now that the statute is declared constitutional we adopt and declare the above holding herein as the proper and only interpretation the statute could and should be given. A court cannot, under the guise of its powers of construction, rewrite a statute, supply omissions, or make other changes and this is particularly true where it appears, as here, that the matter was intentionally omitted. State ex rel. Belker v. Board of Educational Lands & Funds (dissenting opinion by Carter, J., supported by a majority of the court), on rehearing, *ante* p. 270, 175 N. W. 2d 63; Long v. Poulos, 234 Ala. 149, 174 So. 230; Seattle Assn. of Credit Men v. General Motors Acceptance Corp., 188 Wash. 635, 63 P. 2d 359; Appeal of Infants Welfare League Camp, 169 Pa. Super. 81, 82 A. 2d 296; Mitchell v. Mitchell, 312 Mass. 154, 43 N. E. 2d 783.

In Armstrong v. Board of Supervisors, 153 Neb. 858, 46 N. W. 2d 602, we said: "If the language of a statute is clear and unambiguous, courts will not by interpretation or construction usurp the function of the lawmaking body and give it a meaning *not* intended or *expressed by the Legislature.*" (Emphasis supplied.)

The statute is constitutional. Nothing could be clearer than its meaning and its mandatory requirement of sale at or above appraised value. All conditions of the statute have been complied with. As we see it, there is nothing left to argue about, and that is the way the Legislature intended it. The Legislature, and not this court (as the majority unsuccessfully opposed), specifies the protections to the trust. They were by: (1) An opening bid at full appraised value and (2) required sale of a 6-year lease on failure of bidding. §§ 72-257 and 72-258, R. S. Supp., 1967.

But even if we were driven by some procrustean (ruthless stretching or cutting to fit) frenzy to create an ambiguity or save the situation we could not, short of outright usurpation. An amendment was offered to the statute in question on the floor of the Legislature to give the Board of Educational Lands and Funds the right to order a new sale and reject bids. Senator Harsh, in explaining his amendment, said: "* * * sometimes you do get a sale of land that is not to the best interests of all the people concerned and I think that we ought to have *a provision in here that the Board have the right to reject some bids.*" (Emphasis supplied.) (1965 Legislative floor debate, page 2902.)

*The amendment was defeated 27 to 10.* The discussion on the floor was about as revealing as the vote, indicating an absolute intention not to give the board any discretion in the matter. (See Legislative floor debate, page 2902 et seq.)

We point out further that this is not a judicial sale and the rules applicable thereto are not relevant. Again the statute provides no procedure for confirmation or review by the board. Again the Legislature specifically rejected such a procedure. The protections, such as they are, are *before* the sale, not after. The statute, section 72-258, R. S. Supp., 1967, says: "Such land shall be sold, at public auction, * * * to the highest bidder. * * * Settlement shall be made by paying cash of not less than twenty per cent of the purchase *price at the time of sale* and the balance shall be payable in cash *within ninety days of the date of sale.*" (Emphasis supplied.)

The only thing to be done is for the buyer to pay "ninety days *after* the sale" and not "ninety days after confirmation." It therefore is indisputably clear that a completed sale took place on the fall of the hammer, and the statute being complied with, the appellees were entitled to a deed on payment and any further attempt

to sell or review subsequent bids were not authorized by law, are void, and may be enjoined.

The judgment of the district court enjoining the Board of Educational Lands and Funds from conducting a new sale is correct and is affirmed.

AFFIRMED.

McCOWN, J., dissenting.

The majority opinion here represents an obvious desire to decide the Belker case once more. See State ex rel. Belker v. State Board of Educational Lands & Funds, 184 Neb. 621, 171 N. W. 2d 156, and on rehearing, *ante* p. 270, 175 N. W. 2d 63. The issues in the Belker case, however, were not and are not the real issues here.

The only real issues in this case are whether the State Board of Educational Lands and Funds has authority under any circumstances to accept a higher upset bid subsequent to a completed statutory sale of school lands, or set the prior sale aside; and second, whether any court having jurisdiction over the school lands trust has any authority to set aside a completed statutory sale of school lands under the factual circumstances partially disclosed by the majority opinion and additionally reflected in the dissent of Judge Smith.

Even if the Belker constitutional issue were critical, which it is not, the conclusion of the present majority on that issue rests upon a misinterpretation of the legislative action relied upon as justification. In both of the previous Belker opinions, the majority grounded the decisions on the assertion that because of legislative rejection of a proposed amendment to the bill, the resulting statutory silence on the issue must be interpreted as showing a clear legislative intent that neither the board nor even a court, should have any authority "to reject or confirm bids," and demonstrated that the Legislature intended to "obstruct the trustee in the performance of its duty."

One of those opinions referred to the critical amendment as one "that would give the Board of Educational

Lands and Funds the right to reject bids." The other opinion said that "in support of amendments," two Senators argued that the board "should have the right to reject bids."

The proposed amendment was to section 2 of L. B. 234, now section 72-257, R. S. Supp., 1967. The first sentence of that section read: "All lands, now owned or hereafter acquired by the state for educational purposes, shall be sold at the expiration of the present leases." The crucial amendment was to insert the words "when the best interest of the state will be served" after the word "sold" in that sentence. The actual amendment was a far-cry from what it was said to be by the Belker majority. The interpretation of the legislative rejection of that amendment as "plainly indicating that the Legislature did not intend that such board as trustee could see to it that the land did sell for its highest market price," is a truly remarkable interpretation of that legislative action.

A far more reasonable interpretation of that action, and the only one finding support in the legislative record, is that if the amendment had been adopted, it would have left the choice of whether to sell school lands or not entirely up to the board, and the board members had advised some members of the Legislature that they did not agree with the legislative mandate to sell all of the lands. See 1965 Legislative floor debate, p. 2902. It is far-fetched indeed to ascribe to the rejection of the proposed amendment by the Legislature an intention to disregard the trust character of school lands, and to wipe out the obligation of the trustee of those lands to exercise the utmost good faith in the handling of the trust property. It is even more far-fetched to assume that it was intended to wipe out the right and duty of courts to supervise the trust for the benefit of the common schools.

The statutory silence and lack of specific authority for resale or setting a sale aside, in the opinion of the

majority in the Belker cases, made the statute requiring the sale of school lands unconstitutional. The interpretation of that same statutory silence by the minority as leaving the existing trust law in operation, was referred to as judicial legislation. While a majority here were formerly quite willing to regard that legislative silence as speaking loudly for a particular and specific interpretation of legislative intention, any different interpretation of it is now referred to as being nothing less than "outright usurpation" of the legislative function. This is simply not true.

Turning now to the real issues in this case, we can find no logical nor legal reason why the decisions and rules governing contracts, trusts, and judicial sales should not be applied here to a statutory sale of school lands. This court long ago decided that the school lands of this state are held in trust for the benefit of the common schools; that the relationship of trustee and beneficiary is a fiduciary one imposing the utmost good faith in the handling of the trust property; and that the courts are charged with supervision of that trust regardless of who may be the trustee. We have also held that anyone dealing with the school lands must do so with knowledge of, and subject to, the trust obligation of the state. Propst v. Board of Educational Lands & Funds, 156 Neb. 226, 55 N. W. 2d 653, 346 U. S. 823, 74 S. Ct. 39, 98 L. Ed. 348. This law pertaining to the trust of lands for the benefit of the common schools grew out of the initial grant of the lands by the United States and its acceptance by the state. The law is judicial in origin, not statutory. It fills the void left by statutory silence and, in fact, is impervious to legislative overruling. Yet, it is from this area of judicial law, applicable specifically to the school lands involved here, that the majority wishes to abdicate in favor of an imagined interpretation of a silently expressed legislative intent.

As to judicial sales, the courts must act in the interest of fairness and prudence and with a due regard to the

rights of all concerned and the stability of judicial sales. See, Siekert v. Soester, 144 Neb. 321, 13 N. W. 2d 139, 152 A. L. R. 527; Michelson v. Wagner, 170 Neb. 28, 101 N. W. 2d 498; Hull v. Hull, 183 Neb. 773, 164 N. W. 2d 455. These holdings also do not derive from any specific statute, but from judicial interpretation and decision. Certainly the obligation of courts as to a sale of trust assets by a trustee of a trust supervised by the court, is equally demanding, even though it also is not specifically required by any statute. As stated by the current majority in the dissenting opinion on rehearing in State ex rel. Belker v. State Board of Educational Lands & Funds, *ante* p. 270, 175 N. W. 2d 63: "Among the duties of a trustee is to require in the case of the sale of trust property that he shall obtain the highest price possible and refuse to make a sale if the sale was fraudulent, or the result of chilled bidding, or any other conduct or circumstance that resulted in an inadequate sale price."

In Rupe v. Oldenburg, 184 Neb. 229, 166 N. W. 2d 417, this court unanimously approved the setting aside of a partition sale even after the sale had been initially confirmed by the court after a higher upset bid. The amount of the upset bid, made after confirmation, exceeded the initially confirmed bid by slightly more than 10 percent. There is no statute which spells out any authority of a court to set aside a judicial sale already completed and confirmed. Neither does any statute authorize an immediate resale to a higher subsequent bidder.

The subsequent bid to the Board of Educational Lands and Funds in this case exceeds the highest bid at the sale by a percentage virtually identical to the Rupe case. We can see no valid reason to reach a different result in this case. The only response to that conclusion in the majority opinion is the flat and unsupported statement that: "this is not a judicial sale and the rules applicable thereto are not relevant." Such authority

is not enough to discard the law of judicial sales, much less the law of contracts and of trusts.

The action of the Board of Educational Lands and Funds in setting aside its prior sale and ordering a resale, upon receipt of a binding bid exceeding the sale price by more than 10 percent and accompanied by certified check and payment of costs of resale, should have been affirmed. The judgment of the trial court should be reversed.

BOSLAUGH, J., dissenting.

The Legislature authorized and directed the Board of Educational Lands and Funds to sell the school lands. It did not authorize the board to give them away.

The issue is quite simple. The question is whether a trustee should be compelled to sell an asset of the trust for less than its full value.

It is the duty of the board to obtain the highest price possible for the land. State ex rel. Reed v. Scott, 18 Neb. 597, 26 N. W. 386; State ex rel. Ebke v. Board of Educational Lands & Funds, 154 Neb. 244, 47 N. W. 2d 520. The purpose of the appraisal for sale purposes is to insure that the full value is received for the land. In this case the appraisal was far below the sale price and less than one-half the amount of the Buell upset bid. It is apparent that the appraisal was defective and that the land should be resold as the board contends.

In State ex rel. Belker v. State Board of Educational Lands & Funds, 184 Neb. 621, 171 N. W. 2d 156, and on rehearing, ante p. 270, 175 N. W. 2d 63, it was pointed out that there is nothing in the act which in any way limits or attempts to limit the jurisdiction or power of the courts to determine whether a sale has been conducted in the manner required by law.

The majority opinion refers to the so-called Harsh-Budd amendment to L.B. 234 which proposed to insert the words "when the best interest of the state will be served" after the word "sold" as it now appears in section 72-257, R. S. Supp., 1967. The effect of the amend-

ment, if it had been adopted, would have been to give the Board of Educational Lands and Funds an uncontrolled discretion as to whether any school lands should be sold. That is a far different matter than the right to refuse to complete a sale when it appears to the board that the land has been sold for less than its full value because of a defective appraisal.

The Legislature has the power to provide the method of administering the public school lands, but the method provided must be one which is within the law governing the administration of trust estates. State ex rel. Ebke v. Board of Educational Lands & Funds, *supra*. The Legislature has not done otherwise. It is the court which has chosen to ignore the rules of law applicable to trust property and trustees acting in a fiduciary capacity.

In State ex rel. Reed v. Scott, *supra*, this court held that it would not interfere with the discretion of the board unless there had been an abuse of the trust. In this case the court has determined to interfere to compel what appears to be an abuse of the trust.

The problem created by the decision in this case, although of judicial origin, may nevertheless be remedied by legislative action. It is a matter to which the Legislature should address itself at the earliest opportunity.

SMITH, J., dissenting.

The following facts are significant: The notice of sale stated: "No sale will be final until approved by the Board . . . and the Board reserves the right to reject any and all bids." The terms were read to both bidders who understood them. The auctioneer announced: "Sold, subject to approval by the Board of Educational Lands and Funds."

The statutory interpretations in the majority opinion, with which I do not concur, ought not to be determinative. The parties in actual fact did not intend the transaction to be a contract which the court finds. We can only conjecture as to the extent the board's procedure

and the understanding of the bidders affected both appraisal and bidding.

Plaintiffs have invoked the extraordinary remedies of injunction and specific performance against the board. This unusual situation, even on the theory of the majority opinion, ought to be governed by this rule: Sometimes "equity does not lay so ready or so vigorous a hand upon a public official board to compel specific performance as it does to enforce the contracts of private parties." Whitlow v. Board of Education, 108 Kan. 604, 196 P. 772 (1921). Plaintiffs' suit is without equity. I respectfully dissent.

NEWTON, J., concurring.

I concur in the opinion of White, C. J., and reluctantly conclude that this court now has no other recourse.

The dissent of Smith, J., is based on the attempt by the Board to reserve "the right to reject any or all bids" and thus implement the statute in a manner specifically rejected by the Legislature as pointed out in the opinion of White, C. J. The dissent of McCown, J., falls into a similar category.

As made apparent in State ex rel. Belker v. Board of Educational Lands & Funds, 184 Neb. 621, 171 N. W. 2d 156, on rehearing, ante p. 270, 175 N. W. 2d 63, we have here a statute deliberately and purposely designed to prevent any possibility of review of school land sales. Because it infringed the right of judicial review of sales of trust property, a majority, though not controlling, of the members of this court found the statute to be unconstitutional. The controlling minority then insisted and now again insists that the right to judicial review can be read into the statute notwithstanding the clearly expressed legislative mandate and intent. This clearly entails amendment by judicial action and the exercise of a power not conferred upon this court. The controlling minority having succeeded in preventing a ruling that the statute was unconstitutional, it must now be regarded as constitutional and enforced in ac-

cordance with the expressed command and intent of the Legislature. Rhetoric may confuse the issue, but the logic contained in the present majority opinion cannot be so readily confounded.

With the passage of sections 72-257 and 72-258, R. S. Supp., 1967, the Legislature made possible and in the case of State ex rel. Belker v. Board of Educational Lands & Funds, *supra*, this court sanctioned a situation permitting the greatest loss of public funds ever witnessed in this state. The fact that all parties acted in good faith does not serve to alleviate or lessen the prospective damage.

According to the June 30, 1968, report of the Board of Educational Lands and Funds, we have 1,611,499.19 acres of school lands in Nebraska, having an appraised value of $70,340,595, or about $43.65 per acre. With the constant inflationary rise in farmland values during the past 30 years, these figures on valuation appear to be inordinately low. This is verified by the sale of the tract now under consideration.

The present case serves to clarify and point up the existing situation and the amount of the prospective loss. The school lands have been most recently appraised at a value of $70,340,595. In this instance, one section of land was sold. This section was appraised at a supposed market value of $35,840. It was sold at auction for $66,560 and thereafter was subject to a bid of $73,225. It is evident that the appraised value was not representative of market value, yet, under the law, the land would have had to have been sold for the appraised value of $35,840 had no further bid been received. This would be $37,385 less than the amount finally bid and also less than 50 percent of the final bid. If this is a fair example of what is to be expected from the forced sale of school lands under the existing statute, without discretionary action being vested in the Board of Educational Lands and Funds, the extent of the possible loss to the school fund becomes apparent. The possible loss, on the basis of percentages found in the present case,

could amount to more than the total appraised value of
$70,340,595. Thus far we have mentioned possibilities.
That they would be fully realized is, of course, extremely
unlikely. Nevertheless, where such extreme losses are
theoretically possible, it is obvious that material or
major losses will be sustained. Cases where a single
bidder appears are certain to be found, as where chilled
bidding is encountered, the land is surrounded by other
land under one ownership, or an understanding is ar-
rived at between prospective purchasers, and in other
situations not conducive to free and open bidding.

The theory that appraisal can supplant the protection
afforded by a post-sale scrutiny with a view to deter-
mining the fairness and adequacy of the sale is not
tenable. This is recognized by the Legislature in other
similar fields. For instance, in the sale of lands under
foreclosure or belonging to a trust or decedent's estate,
the Legislature requires a post-sale scrutiny and con-
firmation by the courts. Do lands held in trust by the
state merit any less protection than those owned by
private individuals or their estates? There can be but
one answer. I find it impossible to believe that the
Constitution of Nebraska sanctions such a position and
adhere to the dissenting opinions appearing in the case
of State ex rel. Belker v. Board of Educational Lands &
Funds, *supra*.

SPENCER, J., concurring.

I am in full agreement with the majority opinon here-
in, and join in the concurrence of Newton, J. With refer-
ence to the dissenting opinion of McCown, J., I point
out that the majority of the court pointed up this prob-
lem in suggesting the legislative act was unconstitu-
tional.

With specific reference to the suggestion that the ma-
jority misinterpret the action of the Legislature on sug-
gested amendments to L.B. 234, now section 72-257, R.
S. Supp., 1967, I suggest that the legislative floor dis-
cussion leaves no doubt on that point. In substance,

Senator Harsh said: I move the adoption of the amendment. I think every one of us is interested in the sale of these school lands and that the people, or particularly the children of Nebraska, get the best possible return from them. I think that's the purpose of the introducer in the sale of the property. He then said: "* * * sometimes you do get a sale of land that is not to the best interests of all the people concerned and I think that we ought to have a provision in here that the Board have the right to reject some bids."

The introducer of the bill, in response to Senator Harsh's opening statement, said in part: "Therefore, I feel that this legislature is the group, the one to make the decision and if the Board of Educational Lands and Funds appraises these lands at the market price, we have already agreed in this legislature through our passing this over to Select File, advancing to E and R for review and so forth, that we feel that when you sell at market price, this is the thing to do, to sell and so I feel that if we give this Board of Educational Lands and Funds this privilege of evaluating this land, appraising the land, at the market value, then it will be in the best interests of the state to sell the land so therefore I am opposed to this particular amendment."

Senator Harsh said in closing: "The only thing I have in closing, that I think this is just an effort to try to get as fair and as just a value as we can for the school investments of Nebraska. I'd like to call your attention that this is no different than we now have on the sale of these small tracts, they have a right to reject certain bids. And I think this is just protection and we could have and possibly get a little more money." It is evident to me that the Senator was trying to give the Board the right to reject any bid not in the best interest of the trust, and the Legislature rejected the idea and insisted that title should pass upon the close of the sale.

NEWTON, J., joins in this concurrence.